**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
Fayetteville Division**

| | |
|---|---|
| In re: | Chapter 11 |
| ALLENS, INC. and ALL VEG, LLC,[1] | Case No. 13-73597 (BTB) and 13-73598 (BTB) |
| Debtors. | (Joint Administration Requested) Under Case No. 13-73597 (BTB) |

**DEBTORS' MOTION FOR ENTRY OF ORDERS PURSUANT TO 11 U.S.C. SECTIONS
105, 361, 362, 363 AND 364 AND RULES 2002, 4001, AND 9014 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURES (I) AUTHORIZING DEBTORS TO INCUR
POST-PETITION SECURED INDEBTEDNESS, (II) GRANTING LIENS AND
SUPERPRIORITY CLAIMS TO THE DIP LENDERS, (III) AUTHORIZING USE OF
CASH COLLATERAL AND PROVIDING ADEQUATE PROTECTION, (IV)
MODIFYING THE AUTOMATIC STAY AND (V) SCHEDULING FINAL HEARING**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**")

hereby submit this motion (the "**Motion**")[2], pursuant to sections 105, 361, 362, 363, and 364 of

title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), and Rules

2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),

for entry of interim and final orders substantially in the form of the proposed interim order

annexed as **Exhibit A** (I) authorizing the Debtors to obtain post-petition financing from its Pre-

Petition First Lien Secured Parties (as defined below), pursuant to sections 363 and 364 of the

Bankruptcy Code, (II) granting liens and superpriority claims to the DIP Lender pursuant to

section 364 of the Bankruptcy Code, (III) authorizing use of cash collateral pursuant to section

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: All Veg, LLC (9250) and Allens, Inc. (5020). The Debtors' business address is 305 E. Main Street, Siloam Springs, Arkansas 72761.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, by and among Allens, Inc. (the "**Borrower**"), All Veg, LLC (the "**Guarantor**"), Bank of America, N.A., as agent (the "**DIP Agent**") and the lenders and other financial institutions party thereto or which have extended credit thereunder (the "**DIP Lenders**," collectively with the DIP Agent, the "**DIP Secured Parties**"), dated as of October 28, 2013, annexed hereto as **Exhibit B** (the "**DIP Credit Agreement**", and together with all other agreements, documents and instruments executed and/or delivered with, to, or in favor of the DIP Secured Parties, in each case, as amended, modified or supplemented and in effect from time to time, the "**DIP Loan Documents**").

363 of the Bankruptcy Code and providing adequate protection to the Pre-petition Lenders (as defined below) pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, (VI) modifying the automatic stay and (V) scheduling a final hearing on the relief sought herein.  In support of this Motion the Debtors respectfully state as follows:

### Status of the Case

1.      On the date hereof (the "**Petition Date**"), each of the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors have continued in possession of their properties and are operating and managing their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner.  A creditors committee has not yet been appointed in these cases.

### Jurisdiction, Venue, and Statutory Predicates

4.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1408.  This matter is "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(D).

5.      The statutory predicates for the relief sought herein are sections 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001.

### General Background

6.      Allens, Inc. ("**Allens**"), a wholly owned subsidiary of All Veg, LLC, ("**All Veg**" and together with Allens, the "**Debtors**"), is a leading independent producer of canned vegetables serving the United States retail and foodservice channels.   The Debtors are headquartered in Siloam Springs, Arkansas.  All Veg is a holding company without employees or assets other than the stock of Allens.  A detailed factual background of the Debtors' business and operations, as

well as the events precipitating the commencement of these cases, is more fully set forth in the *Declaration of Jonathan C. Hickman in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.

<u>**Pre-Petition Secured Debt**</u>

7.      As of the Petition Date, the Debtors were obligated on approximately $178 million of secured debt.  The secured debt is comprised of two facilities: (i) a senior secured facility comprised of (a) an asset-based revolving loan in the maximum available amount of $130.0 million (which is currently outstanding in a principal amount of approximately $ 98,406,162.69 million) (the "**Pre-Petition Revolver**") and (b) a term loan in the original principal amount of $35.0 million (which is currently outstanding in a principal amount of approximately $14,166,156.65 million) (the "**Pre-Petition Term Loan**" and together with the Pre-Petition Revolver , the "**Pre-Petition First Lien Facility**"); and (ii) a subordinated secured loan in the original principal amount of $57.0 million (which is currently outstanding in a principal amount of approximately $65,610,820 million).

   a.      <u>**Pre-Petition First Lien Debt**</u>

8.      On or about June 20, 2012, Allens, as borrower, entered into a certain Fourth Amended and Restated Credit Agreement (as amended or modified through the date hereof, the "**Pre-Petition First Lien Credit Agreement**") with Bank of America, N.A. ("**BofA**"), as administrative agent (in such capacity, the "**Pre-Petition First Lien Agent**"), and certain financial institutions from time to time party to the Pre-Petition First Lien Credit Agreement (the "**Pre-Petition First Lien Lenders**" and together with the Pre-Petition First Lien Agent, the "**Pre-Petition First Lien Secured Parties**").  Pursuant to the Pre-Petition First Lien Credit

Agreement, the Pre-Petition First Lien Lenders agreed to provide the Debtors with the Pre-Petition First Lien Facility.

9.      The Obligations (as defined in the Pre-Petition First Lien Credit Agreement, the "**Pre-Petition First Lien Obligations**") under the Pre-Petition First Lien Facility, the First Lien Guaranty (as defined below) and the Loan Documents as defined in the Pre-Petition First Lien Credit Agreement (collectively, the "**Pre-Petition First Lien Loan Documents**") are guaranteed by All Veg pursuant to that certain Parent Guaranty, dated as of June 20, 2012, by All Veg in favor of the Pre-Petition First Lien Agent (the "**First Lien Guaranty**").  In addition, the Pre-Petition First Lien Obligations are secured by first priority liens on and security interests in substantially all of the assets of the Debtors (the "**Pre-Petition First Lien Collateral**") including, without limitation, the Debtors' cash and cash equivalents (the "**Cash Collateral**").

### c.      Pre-Petition Second Lien Debt

10.      On or about June 20, 2012, Allens, as issuer, entered into the Second Lien Note Purchase Agreement (as amended or modified through the date hereof, the "**Pre-Petition Second Lien Agreement**" and together with the Pre-Petition First Lien Credit Agreement, the "**Pre-Petition Credit Agreements**") with Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Pre-Petition Second Lien Agent**" and together with the Pre-Petition First Lien Agent, the "**Pre-Petition Agents**") and certain financial institutions from time to time parties to the Pre-Petition Second Lien Note Agreement (the "**Pre-Petition Second Lien Creditors**" and together with the Pre-Petition Second Lien Agent, the "**Pre-Petition Second Lien Parties**").  The Pre-Petition Second Lien Parties and the Pre-Petition First Lien Parties are collectively referred to herein as the "**Pre- Petition Secured Parties**".

11.     The Obligations (as defined in the Pre-Petition Second Lien Agreement, the "**Pre-Petition Second Lien Obligations**" and together with the Pre-Petition First Lien Obligations, the "**Pre-Petition Obligations**") under the Pre-Petition Second Lien Agreement, the Pre-Petition Second Lien Guaranty (as defined below) and the   Note Documents as defined in the Pre-Petition Second Lien Agreement (collectively, the "**Pre-Petition Second Lien Documents**" and together with the Pre-Petition First Lien Credit Documents, the "**Pre-Petition Loan Documents**")  are guaranteed by the All Veg pursuant to that certain Parent Guaranty, dated as of June 20, 2012, by All Veg in favor of the Pre-Petition Second Lien Agent (the "**Pre-Petition Second Lien Guaranty**" and together with the Pre-Petition First Lien Guarantee, the "**Pre-Petition Guaranties**").   In addition, the Pre-Petition Second Lien Obligations are secured by second priority liens on and security interests in substantially all of the assets of the Debtors (the "**Pre-Petition Second Lien Collateral**" and together with the Pre-Petition First Lien Collateral, the "**Pre-Petition Collateral**") including, without limitation, the Cash Collateral.

### d.     Intercreditor Agreement

12.     The respective rights and obligations between and among the Pre-Petition First Lien Parties and the Pre-Petition Second Lien Parties are set forth in the Intercreditor Agreement dated as of June 20, 2012 by and between the Pre-Petition First Lien Agent and the Pre-Petition Second Lien Agent and acknowledged by the Debtors (the "**Intercreditor Agreement**").

### The DIP Facility[3]

13.     The Pre-Petition First Lien Parties have agreed to provide the Debtors with the use of Cash Collateral and a senior secured, superpriority debtor-in-possession loan facility (the "**DIP**

---

[3]   The summary of terms and conditions set forth in this Motion does not purport to summarize all of the conditions, covenants, representations, warranties, events of default and other provisions which are contained in the Interim Order and the DIP Loan Documents.  In the event of an inconsistency, the Interim Order and the DIP Loan Documents shall control.

**Facility**") to fund ongoing operations and restructuring costs during the Chapter 11 Cases, pursuant to a budget (the "**Budget**") negotiated between the Debtors and the Pre-Petition First Lien Parties, in the aggregate commitment amount of up to $119,166,156.65 (the "**Maximum DIP Amount**").

14.     The DIP Facility is comprised of a DIP Term Loan Facility and a DIP Revolving Credit Facility, as follows:

> **Administrative Agent**: Bank of America, N.A.
>
> **DIP Lenders**: DIP Agent and the other lenders and other financial institutions party thereto or which have extended credit thereunder.
>
> **Borrower**: Allens, Inc.
>
> **Guarantor**: All Veg, LLC
>
> **DIP Term Loan Facility**: a senior secured, superpriority term loan facility in an aggregate principal amount not to exceed $14,166,157.00 (the "DIP Term Loan"), which amount (i) shall be comprised of a dollar-for-dollar roll-up and refinancing in full of the outstanding Pre-Petition Term Loan (the "**Term Loan Roll-Up**"), (ii) shall be deemed funded by the DIP Lenders upon the entry of the Interim Order (as defined below) and shall be deemed to replace the outstanding Pre-Petition Term Loan, and (iii) shall be permanently reduced from time to time pursuant to (and concurrently with) the application of mandatory prepayments of principal to be required. Amounts repaid under the DIP Term Loan Facility may not be reborrowed.
>
> **DIP Revolving Credit Facility**: a senior secured, superpriority revolving loan facility in the maximum aggregate commitment amount of up to $105,000,000 (the "**Maximum DIP Revolver Amount**"), which amount shall be comprised of and shall equal the sum, at any time, of (i) a dollar-for-dollar roll-up and refinancing in full of all outstanding Pre-Petition Revolver under the Pre-Petition First Lien Loan Documents, letters of credit and related reimbursement obligations in respect thereof, and all other interest, liabilities and obligations in respect of the Pre-Petition First Lien Loan Documents (other than the principal balance of the Pre-Petition Term Loan which comprises the Term Loan Roll-Up) outstanding on the Petition Date in an aggregate principal amount of **$98,406,162.69** (the "**Revolver Roll-Up**", and together with the Term Loan Roll-Up, collectively, the "**Roll-Up**"), which Revolver Roll-Up shall be deemed funded by the DIP Lenders upon the entry of the Interim Order and shall be deemed to replace all outstanding Pre-Petition Revolvers, letters of credit, and all

other liabilities and obligations in respect of the Pre-Petition First Lien Loan Documents (other than the Pre-Petition Term Loan which comprises the Term Loan Roll-Up) plus (ii) a revolving line of credit in an amount up to $6,593,837.31.  Letters of credit issued and outstanding under the Pre-Petition First Lien Credit Agreement, upon entry of the Interim Order, shall be deemed to have been issued under the DIP Facility.  Subject to the limitations on availability hereunder and the other terms and conditions set forth herein and in the definitive loan documentation, amounts under the DIP Revolver may be borrowed, repaid and reborrowed during the term of such facility.

An amount of up to approximately $ 98,406,162.69 at any one time outstanding (the "**Interim Advance**") of the Maximum DIP Revolver Amount, approved by the Bankruptcy Court pursuant to the Interim Order shall be available during the period from the date of entry of the Interim Order through the date of entry of the Final Order, the balance of which commitments shall be available only upon and after entry of the Final Order.

15.    The DIP Facility and the use of Cash Collateral would be permitted to be used only (i) to refinance the obligations under the Pre-Petition First Lien Loan Documents and (ii) solely with respect to the DIP Revolving Credit Facility and the use of Cash Collateral (1) to pay interest, costs, fees and other transaction expenses owing to the DIP Agent and the DIP Lenders pursuant to the DIP Loan Documents and/or to the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders pursuant to the Pre-Petition First Lien Loan Documents, (2) to pay the fees and expenses of legal counsel and other professionals retained by the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the DIP Agent and the DIP Lenders, (3) for post-petition operating expenses and other working capital, financing requirements and other general corporate purposes of the Debtors, (4) to pay certain pre-petition claims that are approved by the Court and consented to by the DIP Agent and the Pre-Petition First Lien Agent, (5) to pay certain allowed administrative costs and expenses of the Chapter 11 Cases, (6) for the Carve-Out (as defined below), and (7) to pay certain transaction fees, costs and expenses (other than the transaction fees, costs and expenses owing to the DIP Agent, the DIP Lenders, the Pre-Petition First Lien Agent and/or the Pre-Petition First Lien Lenders), in each case of clauses

(ii)(3) through (7) above, solely in accordance with the Budget (subject to the Variance Covenant (as defined below)) and the orders of the Court approving the DIP Facility (the "**Financing Orders**").

16.    Other  material terms of the DIP Facility are summarized as follows:

| **Availability Under the DIP Facility:** | Revolving loans, not to exceed the Maximum DIP Revolver Amount at any time outstanding, would (subject to certain conditions) be permitted to be borrowed from time to time after the Petition Date ("**DIP Loans**") not to exceed the lesser of (i) the Interim Advance or Maximum DIP Revolver Amount at such time, as applicable, minus the Carve-Out Reserve (as defined below) and such other reserves in such amounts and with respect to such matters, as the DIP Agent may elect to impose from time to time in its commercially reasonable credit judgment, and (ii) the DIP Borrowing Base (as defined below). |
|---|---|
| | The "DIP Borrowing Base" is the sum of: (i) the "Borrowing Base" (on substantially the same basis as in the Pre-Petition First Lien Credit Agreement subject to certain restrictions and modifications set forth in the DIP Loan Documents, minus (ii) such reserves in such amounts and with respect to such matters, as the DIP Agent may elect to impose from time to time in its commercially reasonable credit judgment, including without limitation, an availability block in the amount of $2,000,000, in each case of clauses (i) and (ii) above, and the "**Carve-Out Reserve**" in the amount equal to the sum of: (i) the Post-Default Carve-Out Cap (as defined below) plus (ii) the Pre-Default Accrued Fees (as defined below) plus (iii) an amount determined by the DIP Agent in its reasonable discretion to be sufficient to pay at any time of determination the US Trustee Fees (as defined below). |
| **Interest Rates** | The obligations shall bear interest  (i) if  a Base Rate Term Loan or Base Rate Revolving Credit Loan at the Base Rate  plus the Applicable Margin, and (ii) if a LIBOR Term Loan or LIBOR Revolving Credit Loan at  LIBOR plus the Applicable Margin. |
| **Fees:** | The Borrower shall pay an Unused Line Fee and Letter of Credit Fees, calculated using the same methodology as under the Pre-Petition First Lien Credit Agreement, and such other fees as reflected in the fee letter between the Debtors and the DIP Lenders. |
| **Priority and Security:** | All obligations of the Debtors under the DIP Facility, including, without limitation, all loans and advances made, all letters of credit issued (or deemed issued) under, and all fees, costs and expenses incurred in connection with the DIP Facility (including |

any cash management and hedging obligations with respect thereto) (the "**DIP Obligations**") shall be:

(i)  entitled to joint and several superpriority claim status in the Chapter 11 Cases under Section 507(b) of the Bankruptcy Code with priority over all administrative expense claims (subject to the Carve-Out), unsecured claims and all other claims now existing or hereafter arising under the Bankruptcy Code.  The superpriority claims of the DIP Lenders may be repaid from any cash of the Debtors, including without limitation, Cash Collateral and any proceeds from Avoidance Actions (as defined below);

(ii)  secured, pursuant to Section 364(d) of the Bankruptcy Code, by valid, enforceable first priority, fully perfected security interests in and liens upon  all of the Debtors' rights, title and interest in property of the Debtors' estates as of the Petition Date, and all of the Debtors' right, title and interest in property acquired post-petition (including, without limitation, pursuant to the Final Order, estate causes of action under Chapter 5 of the Bankruptcy Code, together with the proceeds thereof and property received thereby (the "**Avoidance Actions**")), whether now existing or hereafter acquired or arising (collectively, the "**DIP Collateral**"), subject and subordinate only to the Carve-Out and to those liens approved by the DIP Agent that, under applicable law, are senior to, and have not been subordinated to, the liens of the Pre-Petition First Lien Agent under the Pre-Petition First Lien Loan Documents, but only to the extent that such liens are valid, enforceable and nonavoidable liens as of the Petition Date (collectively, "**Permitted Priority Liens**"); for avoidance of doubt, pursuant to Section 364(d) of the Bankruptcy Code, the security interests and liens granted to the DIP Agent, for the benefit of the DIP Lenders, shall have priority over any and all liens and security interests securing the obligations under the Pre-Petition First Lien Loan Documents and/or the Pre-Petition Second Lien Note Documents;

(iii)  secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a first priority, perfected lien on all of the Debtors' rights, title and interest in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were unencumbered, subject and subordinate only to the Carve-Out; and

(iv)  secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a second priority, perfected lien on all of the Debtors' rights, title and interest in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were subject to a Permitted Priority Lien that was perfected prior to the Petition Date or that is perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, subject and

subordinate only to the Carve-Out.

DIP Collateral shall also include (i) any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Agent or the DIP Lenders in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits and (ii) a pledge of not more than 65% of the outstanding Equity Interests in any Subsidiary that is not a Domestic Subsidiary, if any.

**Sale Process Covenants:**    The Debtors shall take the following actions (or obtain the following approvals, as applicable) as soon as possible, but not later than the following dates (all such actions and approvals together with any additional actions or approvals as the DIP Agent and the DIP Lenders deem appropriate, collectively, the "**Sale Milestones**"):

(i)   Not later than November 27, 2013, file a motion under Sections 363(b) and (f) of the Bankruptcy Code ("**Sale Motion**") seeking Bankruptcy Court approval to sell all or substantially all of the Debtors' assets in one transaction or a series of transactions to a purchaser or purchasers acceptable to the DIP Agent and the requisite DIP Lenders (the "**Stalking Horse Bidder**") pursuant to definitive documentation (a) in form and substance acceptable to the DIP Agent and the requisite DIP Lenders or (b) which provides for sufficient cash consideration payable on the effective date thereof to pay in full all obligations and liabilities owing to the DIP Agent and the DIP Lenders (the "**Approved Sale**"), together with a motion ("**Bid Procedures Motion**") for approval of bidding and auction procedures (the "**Bid Procedures**"), in each case, in form and substance acceptable to the DIP Agent, the requisite DIP Lenders, the Pre-Petition First Lien Agent and the requisite Pre-Petition First Lien Lenders.

(ii)  obtain Bankruptcy Court approval, pursuant to an order (the "**Bid Procedures Order**") in form and substance acceptable to the DIP Agent, of the Bid Procedures no later than 21 days after filing the Sale Motion and the Bid Procedures Motion.

(iii)  conduct, subject to Bankruptcy Court approval, an auction in accordance with the Bid Procedures (the "**Auction**") no later than three (3) business days prior to the date of the Sale Hearing (as defined below).

(iv)  conduct a sale hearing (the "**Sale Hearing**") for the Court's consideration of the entry of the Approved Sale Order (as defined below) no later than 90 days after the Petition Date.

(v)  obtain entry by the Court of an order, which order has not been reversed, stayed, modified, amended, vacated or appealed,

approving the Approved Sale (the "**Approved Sale Order**"), in form and substance acceptable to the DIP Agent and the requisite DIP Lenders, no later than 2 days after the date of the Sale Hearing.

(vi)  consummate the Approved Sale by no later than 4 days after the date of the Sale Hearing**.**

**Variance Covenant:**   The Debtors shall not make any disbursements other than those set forth in the Budget (other than disbursements to the DIP Secured Parties and the Pre-Petition First Lien Secured Parties pursuant to the terms of the DIP Loan Documents); provided, however, that (i) actual disbursements (measured on a line-by-line basis and on an aggregate basis) (excluding disbursements set forth in the line items labeled "Professional Fees" and "PACA Payments" in the Budget) for the periods corresponding to the following periods shall not be more, both on a line-by-line basis and on an aggregate basis of (1) 110% of the projected amount of disbursements set forth in the Budget for the one week period ending November 1, 2013, (2) 110% of the cumulative projected amount of disbursements set forth in the Budget for the preceding two week period ending November 8, 2013, (3) 105% of the cumulative projected amount of disbursements set forth in the Budget for the preceding  three week period ending November 15, 2013 or (4) for each week ending on or after November 22, 2013, 105% of the cumulative projected amount of disbursements set forth in the Budget for the preceding  four week period then ending on such date; provided that in each case of clauses (1) through (4) above, such projected disbursements shall not include the projected disbursements set forth in the line items labeled "Professional Fees" and "PACA Payments" in the Budget; (ii) actual cash receipts from operations for the periods corresponding to the following periods shall not be less than (1) 90% of (x) the projected amounts of such receipts set forth in the line item labeled "Cash Receipts—Operating" (the "**Receipts**") in the Budget for the one week period ending November 1, 2013 or (y) the cumulative projected amounts of such Receipts set forth in the Budget for the preceding two week period ending November 8, 2013, or (2) 95% of (x) the cumulative projected amounts of such Receipts set forth in the Budget for the preceding three week period ending November 15, 2013 or (y) for each week ending on or after November 22, 2013, the cumulative projected amounts of such Receipts set forth in the Budget for the preceding  four week period then ending on such date; (iii) actual sales for the periods corresponding to the following periods shall not be less than (1) 90% of (x) the projected amounts of such sales as set forth in the line item labeled "Weekly Sales" (the "**Weekly Sales**") in the Budget for the one week period ending November 1, 2013 or (y) the cumulative projected amounts of

such Weekly Sales set forth in the Budget for the preceding two week period ending November 8, 2013 or (2) 95% of (x) the cumulative projected amounts of such Weekly Sales set forth in the Budget for the preceding three week period ending November 15, 2013, or (y) for each week ending on or after November 22, 2013, the cumulative projected amounts of such Weekly Sales set forth in the Budget for the preceding four week period then ending on such date; and (iv) Minimum Net Cash Flow After Bankruptcy Items (as calculated consistent with the methodology used in calculating "Net Cash Flow After Bankruptcy Items" as identified and used in the Budget but excluding disbursements set forth in the line item labeled "Professional Fees" in the Budget) shall not be less than 91% of, for each week ending on or after November 22, 2013, the cumulative projected Net Cash Flow After Bankruptcy Items (excluding projected disbursements set forth in the line item labeled "Professional Fees" in the Budget) set forth in the Budget for the preceding four week period then ending on such date (collectively, the "**Variance Covenant**").

Notwithstanding the foregoing, (i) disbursements set forth in the line items under the heading designated "Professional Fees" (other than items or amounts set forth in the line item labeled "Non-estate Professional Fees") in the Budget shall at no time exceed (x) on a cumulative basis, the aggregate amount of the Carve-Out Reserve at any time of determination and (y) on an line-by-line basis for each professional identified in the Budget, the budgeted, accrued but unpaid professional fees and disbursements for each such professional so identified (less the amount of any unused retainer in respect of such professional fees held by such professional); and (ii) disbursements set forth in the line item labeled "PACA Payments" in the Budget shall at no time exceed, on a cumulative basis, the aggregate budgeted but unpaid amounts in respect of all such payments.

**Affirmative and Negative Covenants:**

(i) the Debtors shall retain (or continue to retain as the case may be) (1) Alvarez & Marsal North America, LLC (or any affiliates thereof) or such other restructuring consultant to the Debtors reasonably acceptable to the DIP Agent and the Pre-Petition First Lien Agent and (2) Jonathan C. Hickman or such other person who shall be the chief restructuring officer of the Debtors ("**CRO**") reasonably acceptable to the DIP Agent and the Pre-Petition First Lien Agent, in each case of clauses (1) and (2) above, on terms and scope of authority acceptable to the DIP Agent and the Pre-Petition First Lien Agent, which CRO shall have financial and legal control and report to the Restructuring Committee (as defined below), or similar committee, of the Borrower;

(ii) the Borrower shall continue to retain at least two (2)

Independent Directors (as defined below) on the Board of Directors of the Borrower, which Independent Directors shall continue to comprise the sole members of the Restructuring Committee of the Board of Directors of the Borrower (the "**Restructuring Committee**"); it being agreed that "Independent Directors" shall mean Timothy D. Boates and Richard E. Newsted or such replacements therefor who do not directly or indirectly own an equity interest in the Debtors and have no other material relationship with the Debtors, either directly or as a partner, shareholder, consultant or officer of an organization that has a relationship with the Debtors, and which, in each case, are selected in accordance with the resolutions establishing the Restructuring Committee and which are reasonably acceptable to the DIP Agent and the Pre-Petition First Lien Agent;

(iii)  the Borrower shall continue to retain Lazard Middle Market LLC (or another investment bank selected by Debtors and reasonably acceptable to the DIP Agent and the Pre-Petition First Lien Agent) as investment bank, on terms acceptable to the DIP Agent and the Pre-Petition First Lien Agent, to market the assets of the Debtors in connection with obtaining a Stalking Horse Bidder and assist the Debtors with obtaining Bankruptcy Court approval of such sale pursuant to Section 363 of the Bankruptcy Code; and

(iv)  The DIP Loan Documents will contain the affirmative and negative covenants (including financial covenants) made by the Debtors under the Pre-Petition First Lien Credit Agreement and the other Pre-Petition First Lien Loan Documents, with such modifications, additions or deletions thereto and such other affirmative and negative covenants as the DIP Agent and the DIP Lenders shall reasonably require.

**Events of Default:**

"**Events of Default**" shall include the occurrence of any of the following:

(i) the Debtors shall fail to file with the Court a motion requesting the approval of the retention of the CRO, Alvarez & Marsal North America, LLC and Lazard Middle Market LLC, in their respective capacities, within five (5) Business Days of the entry of the Interim Order or the Court shall not have entered an order approving the retention of the CRO, Alvarez & Marsal North America, LLC and Lazard Middle Market LLC, in their respective capacities, on or prior to the date of entry of the Final Order, or such later date as may be agreed to in writing by the DIP Agent.

(ii)  The Final Order shall not have been entered within twenty-four (24) days after the Petition Date.

*NY 243373092v3*

(iii)  Breach of or non-compliance with by any Debtor of (a)  the Budget (including, without limitation, the use of proceeds of the DIP Facility other than as set forth in the Budget) but inclusive of any permitted variance, (b) the Variance Covenant or (c) any other representation, warranty, covenant or agreement  contained in the DIP Loan Documents or in the Financing Orders, subject, in the case of the foregoing clause (c), to a grace period (if any) to be agreed.

(iv)   (A) Any of the Debtors shall fail to comply with the Financing Orders (including any of the Sale Milestones set forth therein), any cash management order or any other order with respect to any of the Chapter 11 Cases affecting in any material respect any DIP Loan Document (including any order in respect of the Sale Milestones specified therein and/or in the Financing Orders), or (B) any of the Debtors shall fail to comply with any order of the Court, other than the orders described in the preceding clause (A), in any material respect.

(v)     Any of the Interim Order (or the Final Order, when applicable), any cash management order, the Bid Procedures Order, the Approved Sale Order or any other order with respect to any of the Chapter 11 Cases affecting in any material respect the DIP Loan Documents (including any order in respect of the Sale Milestones specified herein and/or in the Financing Orders) shall cease to be in full force and effect, or the Court shall enter any order amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order (or the Final Order, when applicable), any cash management order, the Bid Procedures Order, the Bid Procedures, the Approved Sale definitive documentation, the Approved Sale Order or any other such order in any material respect without the prior written consent of the DIP Agent, the requisite DIP Lenders, the Pre-Petition First Lien Agent and the requisite Pre-Petition First Lien Lenders.

(vi)  The Court shall enter any order (A) dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a Chapter 7 case, (B) appointing a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in any of the Chapter 11 Cases, (C) appointing a fiduciary or representative of the estate with decision-making or other management authority over some or all of the Debtors' senior management other than the CRO, or its designated principal, or (D) any other superpriority claim (other than the Carve-Out) or grant of any other lien (including any adequate protection lien) having a priority equal or superior to the claims and lien in favor of the DIP Agent securing the  DIP Obligations or in favor of the Pre-Petition First Lien Agent securing the Pre-

Petition First Lien Obligations (other than the liens in favor of the DIP Agent) shall be granted in any of the Chapter 11 Cases.

(vii)  Other than payments authorized by the Court and which are set forth in the Budget, in each case to the extent authorized by one or more "first day" or other orders satisfactory to the DIP Agent, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness (other than the Pre-Petition First Lien Obligations) or payables (including, without limitation, reclamation claims).

(viii)  The Court shall enter an order granting relief from the automatic stay to the holder or holders of any lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Debtor which have an aggregate value in excess of $250,000.

(ix)   The Termination Date (as defined below) shall have occurred.

(x)   An "Event of Default" under any of the other DIP Loan Documents shall have occurred (such "Events of Default" to include certain events of default under the Pre-Petition First Lien Loan Documents (other than events of default arising solely as a result of the filing of the Chapter 11 Cases or the Debtors' financial condition), and such other events of default as the DIP Agent and DIP Lenders shall reasonably require.

(xi)  The filing by or the acquiescence of the Debtors of any plan of reorganization, without the prior written consent of the DIP Agent, the requisite DIP Lenders, the Pre-Petition First Lien Agent, or the requisite Pre-Petition First Lien Lenders, which does not pay in full, in cash, all Pre-Petition First Lien Obligations and all DIP Obligations on the consummation date of such plan of reorganization.

(xii)  Any Debtor shall file a motion or other pleadings in any of the Chapter 11 Cases (A) to use Cash Collateral of the DIP Lenders under Section 363(c) of the Bankruptcy Code without the DIP Lenders' consent, (B) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code pari passu or senior to the DIP Obligations and/or to the liens securing the DIP Obligations or to the Pre-Petition First Lien Obligations and/or to the liens securing the Pre-Petition First Lien Obligations (other than the financing provided under the DIP Facility) or (C) to take any other action or actions adverse to the DIP Agent or the DIP Lenders or their rights and remedies under any of the DIP Loan Documents or the Financing Orders, or the DIP Agent's or the DIP Lenders' interest in any of the DIP Collateral.

(xiii)   (A) Any of the DIP Loan Documents and/or the Pre-Petition First Lien Loan Documents for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction; (B) any Debtor engages in or supports any challenge to the validity, perfection, first priority, extent or enforceability of any of the DIP Loan Documents or the liens securing the DIP Obligations or the Pre-Petition First Lien Loan Documents or the liens securing the Pre-Petition First Lien Obligations including without limitation seeking to equitably subordinate or avoid the liens securing the Pre-Petition First Lien Obligations; or (C) any Debtor engages in or supports (other than by way of providing specific factual information in response to inquiries from any such person) any investigation or asserts any claims or causes of action (or directly or indirectly support (other than by the way of providing specific factual information in response to inquiries from any such person) assertion of the same) against the DIP Agent, the DIP Lenders, the Pre-Petition First Lien Agent or the Pre-Petition First Lien Lenders; provided, however, that it shall not constitute an Event of Default if the Debtors provide information with respect to the Pre-Petition First Lien Loan Documents to a party in interest, or are compelled to provide information by an order of the Court so long as DIP Agent or the DIP Lenders have been served with the request for such an order or, if no such service has been made prior to the time the Debtors are required to provide information, so long as the Debtors provide prior written notice to the DIP Agent, the DIP Lenders, the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders of any intention or requirement to do so.

(xiv)   Any person shall obtain a Section 506(a) judgment or similar determination with respect to the Pre-Petition First Lien Obligations that is unacceptable to the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders.

(xv)   Entry of an order by the Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the DIP Collateral (other than the Carve-Out).

(xvi)   Any Debtor files a motion with the Court or supports a motion filed with the Court which fails to provide that the DIP Agent, on behalf of the DIP Lenders, or the Pre-Petition First Lien Agent, on behalf of the Pre-Petition First Lien Lenders, has the right to credit bid for any assets of the Debtors in connection with any sale pursuant to Section 363(k) of the Bankruptcy Code or pursuant to a plan of reorganization.

(xvii)   Unless consented to in writing by the DIP Agent and the DIP Lenders, entry of an order by the Court authorizing an Approved Sale, the proceeds of which are not in an amount

sufficient to pay, in full, in cash, all DIP Obligations, all Pre-Petition First Lien Obligations and all claims prior thereto or on parity therewith on the effective date of such Approved Sale.

(xviii)   On the date that is 7 days following the entry of the Interim Order by the Court, after giving effect to the payment of all fees and expenses to be paid by such date and all borrowings to be made on such date, Excess Revolving Loan Availability under the DIP Facility is less than $3,000,000 (or $5,000,000 inclusive of the availability block).

(xix)   On the date of the entry of the Final Order by the Court, after giving effect to the payment of all fees and expenses to be paid by such date and all borrowings to be made on such date, Excess Revolving Loan Availability under the DIP Facility is less than $3,000,000 (or $5,000,000 inclusive of the availability block);

(xx)   Any lien purported to be created under any Financing Order and/or DIP Loan Document shall cease to be, or shall be asserted by any Debtor not to be, a valid, perfected and unavoidable first priority lien on any DIP Collateral, with the priority required by the applicable Financing Order or DIP Loan Document.

(xxi)   Such other Events of Default as the DIP Agent may reasonably require.

**Remedies Upon an Event of Default:**   Upon the occurrence and during the continuance of any Event of Default beyond the applicable grace period (if any) set forth above, the DIP Agent may, and upon the direction of the requisite DIP Lenders shall, take all or any of the following actions without further order of or application to the Court, in each case, notwithstanding the provisions of Section 362 of the Bankruptcy Code, <u>provided</u> that the DIP Agent shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of any Debtor in the DIP Collateral only upon three (3) business days' prior written notice of such Debtor and counsel approved by the Court for the Creditors' Committee (as defined below), during which period a Debtor, the Creditors' Committee and/or the U.S. Trustee may seek an emergency hearing before the Court for the sole purpose of determining whether an Event of Default has occurred; <u>provided</u> that the Debtors shall have no right to use or seek to use Cash Collateral and may not use the proceeds of any advances made under the DIP Facility during such three (3) business day-period other than (i) for the satisfaction of the DIP Obligations and the Carve-Out, (ii) for the payment of payroll in accordance with the Budget and (iii) as otherwise consented to in writing by the DIP Agent.  Unless during such three (3) business day-period the Court determines that an Event of Default has not occurred, upon the expiration of such three (3) Business Day-period, (x) the Debtors shall no

longer have the right to use Cash Collateral pursuant to the DIP Loan Documents or the Financing Orders, except with respect to the Carve-Out as provided in the DIP Loan Documents and the Financing Orders, (y) the DIP Agent shall have relief from the automatic stay without further notice or order and may foreclose on all or any portion of the DIP Collateral or otherwise exercise remedies against the DIP Collateral permitted under the DIP Loan Documents, the Financing Orders and applicable non-bankruptcy law, including the exercise of rights of setoff, and (z) the DIP Agent shall be deemed appointed, with full power of substitution, as the true and lawful attorney-in-fact for each Debtor with full power and authority in the place and stead of the Debtors or in the DIP Agent's own name, in each case, in the DIP Agent's discretion, to take any action and to execute any and all documents and instruments to maintain, complete the manufacturing, processing and/or packaging of, sell, lease, liquidate or dispose of the DIP Collateral and to any other exercise remedies against the DIP Collateral permitted under the DIP Loan Documents, the Financing Orders and applicable non-bankruptcy law.  Without limiting the foregoing, such rights and remedies include the rights to:

(1)    declare the principal of and accrued interest on the outstanding borrowings, and any other DIP Obligations, to be immediately due and payable and terminate, as applicable, any further commitments under the DIP Facility and/or terminate, as applicable, the right of the Debtors to use Cash Collateral; and

(2)  take any other action or exercise any other right or remedy (including without limitation, with respect to the liens in favor of the DIP Agent on behalf of the DIP Lenders and the collateral) permitted under the DIP Loan Documents or applicable law (including, without limitation, (i) direct any or all of the Debtors to sell or otherwise dispose of any or all of the collateral on terms and conditions reasonably acceptable to the DIP Agent and the requisite DIP Lenders pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Debtor to assume and assign any lease or executory contract included in the collateral to the DIP Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code) and (ii) enter onto the premises of any Debtor in connection with an orderly liquidation of the collateral).

Pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit the DIP Agent and the DIP Lenders to exercise their remedies under the DIP Loan Documents and the Financing Orders, without further notice, application or motion to, or hearing before, or order from, the Court.

| | |
|---|---|
| **Maturity/Termination Date:** | The DIP Facility and the Debtors' right to use Cash Collateral (as applicable) shall automatically terminate without further notice or court proceedings on the earliest of (i) 24 days after the Petition Date if the Final Order is not entered; (ii) February 14, 2014 (iii) the date of acceleration of any outstanding borrowings or termination of all commitments under the DIP Facility; (iv) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto; (v) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Agent and the requisite DIP Lenders; (vi) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the DIP Agent and the requisite DIP Lenders; (vii) the date of consummation of the Approved Sale; and (viii) the effective date of any Debtors' plan of reorganization confirmed in the Chapter 11 Cases (the "**Termination Date**"), unless extended, as to the DIP Facility, with the prior written consent of the DIP Agent and DIP Lenders and, as to the use of Cash Collateral, the Pre-Petition First Lien Agent and Pre-Petition First Lien Lenders. |
| **Second Lien Adequate Protection:** | The Pre-Petition Second Lien Agent shall solely receive, as adequate protection for the benefit of the Pre-Petition Second Lien Creditors, a valid, enforceable, fully perfected replacement lien on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date and all of the Debtors' rights in property acquired post-petition, whether now existing or hereafter acquired, subject and subordinate only to (i) the liens of the DIP Agent for the benefit of the DIP Lenders in respect of the DIP Facility, (ii) the liens of the Pre-Petition First Lien Agent, for the benefit of the Pre-Petition First Lien Lenders, (iii) the Carve-Out, and (iv) any Permitted Priority Liens; provided, however, that the adequate protection liens described in this paragraph (x) shall be granted only to the extent of any diminution in the value of any Cash Collateral or other collateral arising as a result of the use, sale, or lease of Cash Collateral or other collateral or as a result of the imposition of the automatic stay, and (y) shall not attach to any Avoidance Actions unless the DIP Agent shall have received priority liens on Avoidance Actions, as described herein. |
| **Carve-Out:** | The claims and liens of the DIP Agent for the benefit of the DIP Lenders, on one hand, and the Pre-Petition First Lien Agent for the benefit of the Pre-Petition First Lien Lenders, on the other hand, shall be subject in each case only to (i) allowed and unpaid professional fees and disbursements incurred by the Debtors and the Creditors' Committee in the Chapter 11 Cases on or after the delivery by the DIP Agent of a Carve-Out Trigger Notice, payable under Sections 330 and 331 of the Bankruptcy Code, in an amount not to exceed (except, until and only so long as otherwise consented to in writing by the DIP Agent) $350,000 in the aggregate (subject to final allowance by the Court and which |

remain unpaid after application of any retainers in respect of such professional fees) (the "**Post-Default Carve-Out Cap**") plus, (ii) subject to (and solely to the extent included in) the Budget and final allowance by the Court, the aggregate amount of any budgeted, accrued but unpaid professional fees and disbursements for each professional identified in the Budget in the line item for such professional under the heading designated "Professional Fees" (other than "Non-estate Professional Fees") (less the amount of any unused retainer in respect of such professional fees held by such professional) incurred by the Debtors and the Creditors' Committee in the Chapter 11 Cases prior to the delivery by the DIP Agent of a Carve-Out Trigger Notice measured on a cumulative basis for such pre-notice period (the "**Pre-Default Accrued Fees**") plus, (iii) the amount of any unpaid fees required to be paid in the Chapter 11 Cases to the Clerk of the Court and to the office of the US Trustee under 28 U.S.C. §1930 (whether arising prior to or after the delivery of the Carve-Out Trigger Notice) (the "**US Trustee Fees**") (the foregoing clauses (i) through (iii), together, the "**Carve-Out**").

The foregoing Carve-Out shall not be reduced by the amount of any compensation and reimbursement of expenses paid or incurred (to the extent ultimately allowed by the Court) prior to the occurrence of the Carve-Out Date; provided, however, that following the Carve-Out Date, any amounts paid to professionals by any means will reduce the Carve-Out on a dollar-for-dollar basis; and provided, further, that nothing herein shall be construed to impair the ability of any party in interest to object to any of the fee, expenses, reimbursement or compensation sought by the professionals retained by the Debtors or the Creditors' Committee.

| | |
|---|---|
| **Section 506(c) Waiver:** | Upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any collateral pursuant to Section 506(c) of the Bankruptcy Code or any similar principle of law. |
| **Section 552(b):** | Upon entry of the Final Order, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under Section 552(b) of the Bankruptcy Code. |
| **Acknowledgements and Stipulations:** | The Debtors stipulate and acknowledge (i) to the amount, validity, priority and enforceability of the "Obligations" under and as defined in the Pre-Petition First Lien Loan Documents, (ii) that the Pre-Petition First Lien Agent for the benefit of the Pre- |

Petition First Lien Lenders has a valid, enforceable and fully perfected first priority lien in all of the Pre-Petition Collateral, including Cash Collateral, and all proceeds thereof, (iii) to the amount, validity, priority and enforceability of the Pre-Petition First Second Lien Loan Debt, (ii) that the Pre-Petition Second Lien Agent, for the benefit of the Pre-Petition Second Lien Lenders has a valid, enforceable and fully perfected second priority lien in all of the Pre-Petition Collateral, including Cash Collateral, and all proceeds thereof. The Debtors provide releases to the DIP Agent and the DIP Lenders, the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders, and the Pre-Petition Second Lien Agent and the Pre-Petition Second Lien Lenders, which would not bind the Creditors' Committee or other parties in interest until the expiration of the period described in the paragraph below titled "Challenge Period".

**Challenge Period:**     (i) In the case of a Creditors' Committee, 60 days of the appointment of the Creditors' Committee, or (ii) in the case of a creditor or other party in interest (other than the Creditors' Committee), 75 days of the entry of the Interim Order. If such an adversary proceeding is not commenced within such period, then the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders shall automatically receive full releases and the liens of the Pre-Petition First Lien Agent on behalf of the Pre-Petition First Lien Lenders shall be valid, perfected, enforceable and unavoidable without any further action by the Pre-Petition First Lien Agent or Pre-Petition First Lien Lenders under the terms of the Final Order.

**Expenses:**     The reasonable, documented fees, costs and expenses incurred or accrued by the DIP Agent and/or the DIP Lenders (the foregoing to include all unpaid prepetition fees, costs and expenses incurred by the DIP Agent and/or the DIP Lenders in connection with the DIP Facility) in connection with any and all aspects of the Debtors' Cases, promptly upon submission by such professional of a summary invoice setting forth such fees, costs and expenses.

**Indemnification:**     Debtors shall agree to indemnify and hold harmless the DIP Agent and the DIP Lenders and each of their respective affiliates and shareholders, members, partners or other stakeholders and each of the foregoing's respective officers, directors, employees, agents, advisors and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful

misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.

**D.**     *Consensual Use of Cash Collateral and Adequate Protection*

17.     In connection with entry into the DIP Facility, the Debtors are also requesting that the Court authorize the consensual use of Cash Collateral, subject to the terms of the Financing Orders and the Budget.  As discussed, *supra*, the Pre-Petition First Lien Lenders consent to the Debtors' use of cash collateral and the DIP Facility and the Pre-Petition Second Lien Lenders have, by and through the Intercreditor Agreement, agreed not to object to the DIP Lenders' provision of the DIP Facility and the Debtors' use of cash collateral, under the terms described in Section 5.2(c) of the Intercreditor Agreement.  As such, section 363(c)(2)(A) of the Bankruptcy Code (requiring the consent of "each entity that has an interest in such cash collateral") is satisfied.

## Relief Requested

18.     By this Motion, the Debtors request that the Court (a) approve the Debtors' entry into the DIP Facility and granting the DIP Liens, (b) authorize (i) the Debtors' use of Cash Collateral; and (ii) the Debtors' provision of adequate protection to the Pre-Petition Lenders for the usage of Cash Collateral; (c) schedule a final hearing on the Motion; (d) grant a waiver of any stay of the effectiveness of the order approving this Motion; and (e) grant such other and related relief as if just and proper.

19.     The Debtors submit that the relief requested herein is in the best interests of the Debtors, their estates and stakeholders, and presents the best opportunity for the Debtors to maximize the value of their estates.

## Basis for Relief Requested

**A.    *Post-petition Financing Under Section 364 of the Bankruptcy Code***

20.    Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is: (a) entitled to a superpriority administrative expense status; (b) secured by a lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property if the debtor cannot obtain post-petition credit on an unsecured basis, as an administrative expense priority or secured solely by junior liens on the debtor's assets.  *See* 11 U.S.C. § 364(c);[4] *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.,* 266 B.R. 575, 584 (S.D.N.Y. 2001) (authorizing superpriority administrative expenses where debtor could not obtain credit as an administrative expense).

21.    Additionally, section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur post-petition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection" of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.  *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if
>
> (A) the [debtor] is unable to obtain credit otherwise; and

---

[4] Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt — (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a junior lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

22.     Courts have fashioned guidelines in applying these statutory requirements. Generally, courts advocate using a "holistic approach" to evaluate superpriority post-petition financing agreements, focusing on the transaction as a whole.  As one court has noted:

> Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

*In re Aqua Assocs.,* 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

23.     More specifically, in evaluating a debtor's proposed post-petition financing, courts consider whether the post-petition financing (a) is necessary to preserve the assets of the estate and is necessary, essential and appropriate for continued operation of the Debtors' business, (b) is in the best interests of the Debtors' creditors and estates, (c) is an exercise of a debtor's sound and reasonable business judgment, (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and the lenders on the other and (e) contains terms that are fair, reasonable and adequate given the circumstances of the debtor and the proposed post-petition lender.  *See, e.g., East West Resort Dev. V, L.P., L.L.P.,* Case No. 10-10452 (BLS) (Bankr. D. Del. Mar. 11, 2010).

24.     The Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

**B.**    ***Entry into the DIP Facility is in the Best Interests of the Debtors' Creditors and Estates, is Necessary to Preserve Estate Assets and is an Exercise of the Debtors' Sound and Reasonable Business Judgment***

25.    A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g., Trans World Airlines, Inc. v. Travelers Intl AG* (*In re Trans World Airlines, Inc.*)*,* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *In re Ames Dep't Stores, Inc.*, 115 B.R, 34, 38 (Bankr. S.D.N.Y. 1990) (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment); *Bray v. Shenandoah Fed Say & Loan Ass'n (In re Snowshoe Co., Inc.),* 789 F.2d 1085, 1088 (4th Cir, 1986); *Ames Dep't Stores,* 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *In re Curlew Valley Assocs*., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981)*; In re Simasko Prod. Co*., 47 B.R. 444, 449 (D. Colo. 1985).

26.    Generally, the business judgment standard requires that, absent evidence to the contrary, a debtor in possession is afforded discretion to act with regard to business decision-making.  *See Simasko Prod.,* 47 B.R. at 449 ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).  Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also Curlew Valley,* 14 B.R. at 513-14 (noting that courts should not second guess a debtor's business

decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

27.     The Debtors' decision to enter into the proposed DIP Facility satisfies this standard. This decision is the culmination of an intense, several week-long process targeted at negotiating an overall financial and operational restructuring of the Debtors.  The Pre-Petition First Lien Lenders will not agree to the Debtors' use of Cash Collateral alone.  If the Debtors do not obtain post-petition financing, they would not be able to continue operating their businesses, resulting in lost jobs and a destruction of value.

28.     Entry into the DIP Facility and securing the financing available thereunder is absolutely necessary to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties in interest.   Thus, entry into the DIP Facility is an exercise of the Debtors' sound business judgment.  Given the Debtors' liquidity needs, the DIP Facility is of critical importance to the Debtors' continued operations and to preserving going concern value, especially following the commencement of these chapter 11 cases and the general uncertainty in the marketplace that will accompany this process.

29.     Specifically, the Debtors have an urgent need to obtain access to the DIP Facility to, among other things, continue the operation of their businesses in an orderly manner, maintain business relationships and assure the continuity of operations with, and ability to make payment to, vendors, suppliers and customers, pay their employees and satisfy other working capital and operational needs, while pursuing a sale or other restructuring — each of which is vital to preserving and maintaining the value of these estates for the benefits of all stakeholders.

Moreover, the Debtors believe that access to the DIP Facility will provide comfort and confidence to all parties in interest at this critical juncture.

**C.**   *The Terms of the DIP Facility are Fair, Reasonable and Appropriate*

30.   It is well recognized that the appropriateness of a proposed post-petition financing facility must be considered in light of current market conditions.  *See, e.g., Snowshoe Co.,* 789 F.2d at 1088 (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable).  Indeed, courts often recognize that where there are few lenders likely, able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd,* 99 B.R. 117 (N.D. Ga. 1989).

31.   Given the Debtors' severe liquidity problems and their overall value as compared to the amount of debt outstanding under the Pre-Petition Loans, the DIP Facility was the only post-petition financing available to satisfies the Debtors' liquidity needs.  Accordingly, the Debtors submit that the terms of the DIP Facility are reasonable and represent the best source of financing available to the Debtors under the circumstances.

**D.**   *The Scope of the Carve-Out is Appropriate*

32.   The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out.  Similar carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *See Ames,* 115 B.R. at 40.  The DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  *Id.* at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties in interest

are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and any committee of unsecured creditors, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

**E.**      *The "Roll-Up" of Pre-Petition Debt is Appropriate*

33.    The DIP Facility contemplates the roll-up of the Pre-Petition First Lien Debt upon entry of the Interim Order.  Specifically, the DIP Facility provides that proceeds from the DIP Facility shall be used to pay, in full, the outstanding Pre-Petition First Lien Debt.  As a condition to providing the Debtors the funding they need to operate their businesses, the DIP Lender insisted that a commitment of post-petition financing would be unavailable absent a roll-up of the obligations under the Pre-Petition First Lien Credit Agreement.  Accordingly, the DIP Lender would not have agreed to provide the DIP Facility without a roll-up and deemed refinancing of the obligations due and owing under the Pre-Petition First Lien Credit Agreement.

34.    After careful consideration of the terms of the proposed roll-up, the Debtors determined that the roll-up was appropriate and necessary under the circumstances.  The financing contemplated herein is the Debtors' sole liquidity source and will offer the Debtors the much-needed funds to continue operating as a going concern.  Therefore, the Debtors believe that the roll-up is a necessary component to the DIP Facility and will ensure the Debtors' access to sufficient liquidity for working capital and general corporate purposes to fund day-to-day operations.

35.    The Bankruptcy Code does not prohibit roll-ups, whether provided as adequate protection or otherwise.  Indeed, recent cases suggest that roll-ups are becoming an increasingly

common feature in debtor-in-possession financing arrangements and courts have approved full roll-ups in a variety of cases, with several courts permitting roll-ups of prepetition debt on the first day of the case.  *See, e.g., In re Source Interlink Cos. Inc.,* No. 09-11424 (Bankr. D. Del. Apr. 29, 2009) (authorizing approximately $139 million DIP that included roll-up of approximately $110 million prepetition debt pursuant to interim order granted on first day of case); *In re Dayton Superior Corp.,* No. 09-10785 (Bankr. D. Del. Apr. 19, 2009) (authorizing approximately $165 million DIP that included full roll-up of approximately $102 million prepetition debt pursuant to interim order granted on first day of case); *In re Pacific Energy Resources, Ltd.,* No. 09-10785 (Bankr. D. Del. Mar. 10, 2009) (authorizing approximately $183 million DIP that included full roll-up of approximately $143 million prepetition debt pursuant to interim order granted on first day of case); *In re Foamex International Inc.,* No. 09-10560 (Bankr. D. Del. Feb. 20, 2009) (authorizing approximately $95 million DIP that included full roll-up of approximately $39 million prepetition debt pursuant to interim order granted on first day of case); *In re Hilex Poly Co. LLC,* No. 08-10890 (Bankr. D. Del. May 7, 2008) (authorizing approximately $140 million DIP that included full roll-up of approximately $51 million prepetition debt pursuant to interim order granted on first day of case); *In re Holley Performance Products Inc.,* No. 08-10256 (Bankr. D. Del. Feb. 12, 2008) (authorizing approximately $60 million DIP that included full roll-up of approximately $30 million prepetition debt pursuant to interim order granted on first day of case).

F.    ***The Stipulations and Acknowledgements and Waivers of the Debtors are Appropriate and Reasonable***

36.    The Interim Order and the DIP Credit Agreement include certain acknowledgements, stipulations, waivers and releases by the Debtors regarding, among other things, the amount, validity, priority, perfection and enforceability of the liens and claims of the Pre-Petition Secured

Parties and the DIP Secured Parties. The Interim Order further provides a reservation of rights for parties in interest with standing and any official committee of unsecured creditors seeking to challenge such agreements of the Debtors, so long as such an objection or challenge is raised during the Challenge Period. Because this provision affords parties in interest the requisite investigation period, the Debtors respectfully submit that the proposed agreements by the Debtors are reasonable under the circumstances.

37. The Interim Order and the DIP Credit Agreement provides for a waiver of the Debtors' rights *vis a vis* the Prepetition Secured Parties under Bankruptcy Code Section 506(c), only upon entry of the Final Order. As the effectiveness of this waiver will be delayed until the entry of the Final Order, the Debtors respectfully submit that parties in interest will have an opportunity to be heard and, as such, this limitation renders the proposed lien reasonable under the circumstances.

**G.      *The DIP Facility was Negotiated in Good Faith and Should be Afforded the Protection of Section 364(e) of the Bankruptcy Code***

38. Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

39. The terms of the DIP Facility were negotiated in good faith between the Debtors and the DIP Lender, and all of the DIP Facility obligations will be extended by the DIP Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code). The terms of the DIP Facility were negotiated between the Debtors and the DIP Lender, each of which was represented by separate counsel. No consideration is being provided to any party in connection

with the DIP Facility other than as set forth herein. Moreover, the DIP Facility has been extended in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code and the DIP Lender should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed or modified on appeal or otherwise. *See* 11 U.S.C. § 363(e).

**H.     The Debtors' Proposed Grant of Adequate Protection to Use Cash Collateral is Appropriate**

40.     The DIP Facility contemplates providing the DIP Lender with post-petition Liens on substantially all assets of the Debtors, including the Pre-Petition Collateral, pursuant to section 364(c)(2) and/or 364(d) of the Bankruptcy Code that will be *pari passu* with the Pre-Petition Liens, subject to the Intercreditor Agreement. Pursuant to section 363(c) of the Bankruptcy Code, the Debtors may only use cash collateral of the Pre-Petition Lenders subject to the consent of the Pre-Petition First Lien Lenders or the grant of adequate protection. 11 U.S.C. § 363(c)(2).

41.     The Pre-Petition Second Lien Lenders have consented to the proposed DIP Facility and the granting of the DIP Liens *pari passu* with the Pre-Petition Liens, pursuant to the terms of the Intercreditor Agreement, and subject to the granting of adequate protection as set forth in the Order. In addition, the Debtors propose and intend to grant replacement liens to the Pre-Petition Second Lien Lenders as adequate protection. Accordingly, the Debtors' use of cash collateral satisfies the requirements of sections 363(c)(2) and/or 364(d) of the Bankruptcy Code, as applicable. *See 11 U.S.C. §§ 363(c), 364(d).*

**I.     Approval of the DIP Facility on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm**

42.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion.  If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

FED. R. BANKR. P. 4001(c)(2).

43.     In examining requests for interim relief under the immediate and irreparable harm standard, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g., Ames Dept Stores,* 115 B.R. at 36; *Simasko,* 47 B.R. at 449.  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business.  *Ames Dept. Stores*, 115 B.R. at 36.

44.     Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis.  As described in detail herein, and in the First Day Declaration, the Debtors have an immediate need to obtain access to liquidity to, among other things, provide comfort to their employees, customers and suppliers as well as to continue to operate their businesses, maintain key business relationships, make payroll and satisfy other working capital and operational needs.  Funding each of these expenditures is necessary to preserve and maintain the value of the Debtors' estates for the benefit of all parties in interest.

45.     Without approval of the DIP Facility, trade vendors might discontinue the provision of goods and services, which would disrupt operations and frustrate the Debtors' reorganization and/or sale efforts.  Additionally, absent access to liquidity under the DIP Facility, the Debtors face the potential inability to satisfy their payroll and other direct operating expenses necessary to run their businesses in the ordinary course.  Thus, availability of sufficient working capital and liquidity is vital to the preservation and maintenance of the value of the Debtors' estates.

46.     The crucial importance of a debtor's ability to secure post-petition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized.  *See, e.g., In re Taylor-Wharton Intl LLC,* Case No. 09-14089 (Bankr. D. Del. Nov. 20, 2009); *In re Lazy Days' R.V. Center Inc.,* Case No. 09-13911 (Bankr. D. Del. Nov. 6, 2009); *In re Source Interlink Cos.,* Case No. 09-11424 (Bankr. D. Del. May 28, 2009); *In re Abitibi-Bowater Inc.,* Case No. 09-11296 (Bankr. D. Del. Apr. 20, 2009); *In re EZ Lube, LLC,* Case No. 08-13256 (Bankr. D. Del. Jan 14, 2009).

**J.     Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code is Appropriate Under the Circumstances**

47.     The Interim Order proposes that the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted to allow the DIP Lender, in its sole discretion, file the Interim Order or such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments or otherwise confirm perfection of such liens, security interests and mortgages.  The Interim Order also proposes that, after the occurrence of any Event of Default and at any time thereafter upon three (3) business days prior notice of such occurrence, in each case given to each of the Debtors, counsel for the Creditors' Committee, if any, and the U.S. Trustee, Court, the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted to allow the DIP Secured Parties to exercise their rights and remedies in accordance with the DIP Loan Documents.

48.     Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Facility and the proposed DIP Orders.

**K.**    *Relief from the Fourteen Day Waiting Periods Under Bankruptcy Rules 6004(h) is Appropriate*

49.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  The Debtors request that the Interim Order be effective immediately by providing that the fourteen-day stay under Bankruptcy Rules 6004(h) is waived.

50.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to FED. R. BANKR. P. 6004(h).  Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

51.    As set forth above, entry into the DIP Facility is critical to enable the Debtors to continue to fund their operations and the expenses of these chapter 11 cases, absent which the Debtors' estates will be irreparably harmed.  The Debtors therefore request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) to the extent it applies.

## Request For Final Hearing

52.    Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2(c), the Debtors requests that the Court schedule the final hearing on the Motion for a date not later than November 19, 2013.

**No Prior Request**

53.      No prior Motion for the relief requested herein has been made to this or any other court.

**Notice**

54.      As this Motion is seeking "first day" relief, the Debtors are serving copies of the Motion as a "First Day Motion" by email, fax or overnight mail to the "Special Service List" as defined and set forth in the *Motion To Limit Notice, Approve Special Service List And Establish Notice Procedures* and the *Motion For Expedited Hearing On First Day Motions*, each filed on the Petition Date.  In addition, the Debtors are serving copies of the motion by overnight mail on (a) the Pre-Petition First Lien Agent, (b) the Pre-Petition Second Lien Agent,  and (c) all other secured creditors of record  The Debtors respectfully submit that because the relief requested in the Motions is necessary to avoid immediate and irreparable harm to the Debtors' estates, cause exists to limit the notice pursuant to 11 U.S.C. § 102(1) and Bankruptcy Rule 2002(a)(2) and that no other or further notice is necessary.

**Conclusion**

WHEREFORE, the Debtors respectfully request that this Court enter an interim order, substantially in the form attached hereto as **Exhibit A**: (I) authorizing the Debtors to obtain post-petition financing from the DIP Lender pursuant to sections 363 and 364 of the Bankruptcy Code, (II) granting liens and superpriority claims to the DIP Lender pursuant to section 364 of the Bankruptcy Code, (III) authorizing use of cash collateral pursuant to section 363 of the Bankruptcy Code, (IV) providing adequate protection to the Pre-Petition Lenders pursuant to

sections 361, 362, 363, and 364 of the Bankruptcy Code, and (V) scheduling a final hearing on the relief sought herein.

Dated:  October 28, 2013       Respectfully submitted,

MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201-3525
Telephone: (501) 688-8800
Facsimile: (501) 688-8807

By:    */s/ Stan D. Smith*
Stan D. Smith (Ark. Bar No. 90117)
Lance R. Miller (Ark. Bar No. 85109)
Chris A. McNulty (Ark. Bar No. 08198)

-and-

GREENBERG TRAURIG, LLP
Nancy A. Mitchell (*pro hac vice pending*)
Maria J. DiConza (*pro hac vice pending*)
Matthew L. Hinker (*pro hac vice pending*)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400

*Proposed Counsel for the Debtors
and Debtors in Possession*