**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**Fayetteville Division**

| | |
|---|---|
| In re: | Chapter 11 |
| ALLENS, INC. and ALL VEG, LLC,[1] | Case No. 13-73597 (BTB) and 13-73598 (BTB) |
| Debtors. | (Joint Administration Requested) Under Case No. 13-73597 (BTB) |

### DECLARATION OF JONATHAN C. HICKMAN IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

I, **JONATHAN C. HICKMAN,** hereby declare, under penalty of perjury, as follows:

1.       I am a Managing Director of Alvarez & Marsal Holdings, LLC ("**A&M**").  I have more than eighteen (18) years of management and financial restructuring experience.  I have advised numerous clients, including public and privately held companies, on business plan development and evaluation, liquidity improvement efforts, asset dispositions, and bankruptcy filing preparation.  I have also assisted in managing and administrating companies during chapter 11 cases.

2.       I have been providing financial consulting services to Allens, Inc. ("**Allens**" or the "**Company**" and together with All Veg, LLC ("**All Veg**") the "**Debtors**") since January 2013.  On July 19, 2013 I was retained as the Chief Restructuring Officer (the "**CRO**") of Allens.  As the CRO, I am responsible for managing the restructuring process for the Debtors under the supervision of the Restructuring Committee of the Board of Directors of Allens.  I perform my duties out of Allens' headquarters located at 305 E. Main Street, Siloam Springs, Arkansas.

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: All Veg, LLC (9250) and Allens, Inc. (5020).  The Debtors' business address is 305 E. Main Street, Siloam Springs, Arkansas 72761.

NY 243023729v13

3.      I submit this declaration (the "**Declaration**") in support of the Debtors' chapter 11 petitions and requests for relief contained in certain "first day" applications and motions filed on or shortly after the date hereof (the "**First Day Motions**").[2]

4.      On October 28, 2013 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I.
## INTRODUCTION

6.      Allens is a leading independent producer of canned vegetables serving the United States retail and foodservice channels.  Allens provides its customers with a full assortment of canned vegetable products under a number of well-known flagship brands, several niche brands, and private label brands.  The Company sources its raw products from a network of trusted third-

---

[2]  All capitalized terms used but otherwise not defined shall have the meanings set forth in the relevant First Day Motion.

*NY 243023729v13*

party growers and suppliers. The Company processes and distributes products from four processing facilities, four labeling facilities and six warehouse facilities predominately located in the southeastern United States.

7.     Over the last several years, the Company has encountered severe operational and liquidity difficulties. As discussed in more detail below, the Company incurred substantial debt to acquire a frozen vegetable business in 2006, which the Company struggled to integrate into their business. Additionally, beginning in 2011 the Company began to face significant operating challenges related to the production of canned vegetables.

8.     While the Debtors have undertaken a number of initiatives to improve the operation of the Company's business, the Company's constrained liquidity, and inability to service their debt, led to the commencement of these cases (the "**Chapter 11 Cases**"). The Debtors have commenced a marketing process to identify potential parties interested in acquiring all or substantially all of the Debtors' assets. The Debtors have also engaged in discussions with several parties interested in potentially providing financing to the Debtors, or to a purchaser of the Debtors' assets. The Debtors intend to consummate either a sale or other deleveraging transaction through these Chapter 11 Cases. The Debtors' existing lenders have agreed to provide support for the Chapter 11 Cases through debtor-in-possession financing.

**II.**
**BACKGROUND**

A.     **Overview of the Debtors**

9.     Allens is a fourth generation family owned business and is one of the largest private canning companies in the world. Allens was founded in 1926 by Earl Allen. Allens survived the depression of the 1930s, and experienced a great deal of growth in the 1940s as the Company supplied canned vegetables to the military during World War II. Allens continued to

3

grow following the war, in large part due to the economic activity of returning servicemen establishing families in the new suburbs, and the development of the larger "super" markets. During the 1960s and 1970s the Company expanded on a number of fronts to keep up with consumer demand, and accommodate a growing slate of products.

10.     During the 1990s and 2000s, Allens, and the entire canning industry, was forced to contend with a decrease in popularity for canned foods.  The increasing availability of fresh produce, frozen produce and the rise of the takeout menu greatly diminished the demand for canned food.  Despite the difficult climate, Allens entered the 2000s looking to expand.  In July 2003, Allens purchased the Veg-All brand of canned mixed vegetables from Birds Eye Foods, Inc. ("**Birds Eye**").  A year later, Allens acquired the popular canned vegetable brand, Freshlike, from Birds Eye.  In 2006, after years of organic and acquisition driven growth in the canned vegetable sector, the Company determined to further diversify its product offerings by acquiring a large private label frozen vegetable business.  The Company struggled to integrate the frozen vegetable business into their existing canned vegetable business, and ultimately, Allens divested the bulk of the frozen business in March 2012.

11.     Today, the Debtors operate primarily out of their headquarters in Siloam Springs, Arkansas.  Allens also operates plants in: (i) Montezuma, Georgia, (ii) Pulaski, Wisconsin, (iii) Turkey, North Carolina, (iv) Siloam Springs, Arkansas, and (v) Van Buren, Arkansas.  The Debtors employ approximately 1173 individuals as part of their business, approximately 448 of whom are located in Arkansas.

12.     Allens manages its business according to its two distribution channels: retail and foodservice.  Allens retail customers include conventional grocery, club, mass, dollar and limited assortment stores and account for approximately 52% of Allens' net sales.  Allens' foodservice

4

customers include national and regional distributors, restaurant chains and food manufactures. The Company markets the same diverse mix of vegetables and beans to each of the two channels, and both segments source products from the same production facilities; however, each segment has a dedicated sales team focused solely on relationships in their respective channels. The majority of the Debtors' retail sales consist of products in 300E (15oz) cans, while the majority of the Debtors' foodservice sales consist of products in #10 (six pound/one gallon) cans.

13.     The current executive officers of the Company include Roderick Allen, who acts as Chairman of the Board; Josh Allen, who acts as Chief Executive Officer; and Nick Allen, who acts as Executive Vice President.  The management team is supplemented by myself and a team from A&M including Markus Lahrkamp, a managing director, Nick Campbell, a director and Cary Daniel, a manager.  The Board of Directors of Allens is comprised of Rick Allen, Josh Allen, Nick Allen, Timothy Boates and Richard Newsted.  Mr. Boates and Mr. Newsted are the Company's independent directors, and also serve on the Restructuring Committee of the Board of Directors of Allens (the "**Restructuring Committee**").  The Restructuring Committee is charged with managing the Company's restructuring process.

**B.**     **Prepetition Capital Structure**

     **i.     Secured Claims**

14.     As of the Petition Date, the Debtors were obligated on approximately $178 million of secured debt.  The secured debt is comprised of two facilities: (i) a senior secured facility comprised of (a) an asset-based revolving loan in the maximum available amount of $130.0 million (which is currently outstanding in a principal amount of approximately $96.5 million) (the "**Pre-Petition Revolver**") and (b) a term loan in the original principal amount of $35.0 million (which is currently outstanding in a principal amount of approximately $14 million) (the "**Pre-Petition Term Loan**" and together with the Pre-Petition Revolver , the "**Pre-**

5

**Petition First Lien Facility**"); and (ii) a subordinated secured loan in the original principal amount of $57.0 million (which is currently outstanding in a principal amount of approximately $65.6 million).

> **a.**     **Pre-Petition First- Lien Debt**

15.     On or about June 20, 2012, Allens, as borrower, entered into a certain Fourth Amended and Restated Credit Agreement (as amended or modified through the date hereof, the "**Pre-Petition First Lien Credit Agreement**") with Bank of America, N.A. ("**BofA**"), as administrative agent (in such capacity, the "**Pre-Petition First Lien Agent**"), and certain financial institutions from time to time party to the Pre-Petition First Lien Credit Agreement (the "**Pre-Petition First Lien Lenders**" and together with the Pre-Petition First Lien Agent, the "**Pre-Petition First Lien Secured Parties**").  Pursuant to the Pre-Petition First Lien Credit Agreement, the Pre-Petition First Lien Lenders agreed to provide the Debtors with the Pre-Petition First Lien Facility.

16.     The Obligations (as defined in the Pre-Petition First Lien Credit Agreement, the "**Pre-Petition First Lien Obligations**") under the Pre-Petition First Lien Facility, the First Lien Guaranty (as defined below) and the "Loan Documents" as defined in the Pre-Petition First Lien Credit Agreement (collectively, the "**Pre-Petition First Lien Loan Documents**") are guaranteed by All Veg, LLC (the "**Parent**") pursuant to that certain Parent Guaranty, dated as of June 20, 2012, by the Parent in favor of the Pre-Petition First Lien Agent (the "**First Lien Guaranty**"). In addition, the Pre-Petition First Lien Obligations (including obligations under the First Lien Guaranty) are secured by first priority liens on and security interests in substantially all of the assets of the Debtors (the "**Pre-Petition First Lien Collateral**") including, without limitation, the Debtors' cash and cash equivalents (the "**Cash Collateral**").

*NY 243023729v13*

### b.   Pre-Petition Second-Lien Debt

17.     On or about June 20, 2012, Allens, as issuer, entered into the Second Lien Note Purchase Agreement (as amended or modified through the date hereof, the "**Pre-Petition Second Lien Agreement**" and together with the Pre-Petition First Lien Credit Agreement, the "**Prepetition Credit Agreements**") with Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Pre-Petition Second Lien Agent**" and together with the Pre-Petition First Lien Agent, the "**Pre-Petition Agents**") and certain financial institutions from time to time parties to the Subordinated Note Agreement (the "**Pre-Petition Second Lien Creditors**" and together with the Subordinated Agent, the "**Pre-Petition Second Lien Parties**"). The Pre-Petition Second Lien Parties and the Pre-Petition First Lien Parties are collectively referred to herein as the "**Pre- Petition Secured Parties**".

18.     The Obligations (as defined in the Pre-Petition Second Lien Agreement, the "**Pre-Petition Second Lien Obligations**" and together with the Pre-Petition First Lien Obligations, the "**Pre-Petition Obligations**") under the Pre-Petition Second Lien Agreement, the Pre-Petition Second Lien Guaranty (as defined below) and the "Note Documents" as defined in the Pre-Petition Second Lien Agreement (collectively, the "**Pre-Petition Second Lien Documents**" and together with the Pre-Petition First Lien Credit Documents, the "**Pre-Petition Loan Documents**")  are guaranteed by the Parent pursuant to that certain Parent Guaranty, dated as of June 20, 2012, by the Parent in favor of the Subordinated Agent (the "**Pre-Petition Second Lien Guaranty**" and together with the Pre-Petition First Lien Guaranty, the "**Prepetition Guaranties**").  In addition, the Pre-Petition Second Lien Obligations are secured by second priority liens on and security interests in substantially all of the assets of the Debtors (the "**Pre-**

Petition Second Lien Collateral" and together with the Pre-Petition First Lien Collateral, the "**Prepetition Collateral**") including, without limitation, the Cash Collateral.

c.     <strong><u>Intercreditor Agreement</u></strong>

19.     The respective rights and obligations between and among the Pre-Petition First Lien Parties and the Pre-Petition Second Lien Parties are set forth in the Intercreditor Agreement dated as of June 20, 2012 by and between the Pre-Petition First Lien Agent and the Pre-Petition Second Lien Agent and acknowledged by the Debtors (the "**Intercreditor Agreement**").

ii.     <strong>Unsecured Claims and Equity</strong>

20.     The Debtors have general unsecured claims which include primarily, among others, outstanding trade claims. As of Petition Date, the Debtors estimate that their outstanding trade claims were approximately $101.9 million.

21.     The equity of Allens is owned by All Veg. The equity of All Veg is owned by members of the Allen family.

**C.     <u>Events Leading to the Chapter 11 Filing</u>**

22.     From its inception in 2006, the integration of the acquisition of the frozen vegetable business and the execution of the business plan proved difficult, and resulted in significant operating loses. As a result, as described above, the Company divested the majority of its frozen operations in March 2012, and is currently exploring strategic alternatives for its remaining frozen processing and repackaging facilities. The Debtors faced further operational challenges beginning in 2011, as a historically strong harvest led to high inventory levels that processors, including the Debtors, were unable to sell before the beginning of the subsequent pack season. Consequently, many processors lowered prices and increased promotional activity, decreasing dollar sales and adversely impacting margins. Further, rising non-vegetable commodity costs, including the cost of cans and fuel, further compressed the Debtors' margins

8

during this time.  Ultimately this resulted in a 9.2% net sales decline and the Debtors' Adjusted Canned EBITDA declined from approximately $46 million in fiscal year 2010, to $8.5 million in fiscal year 2011.

23.     In order to address these operating challenges, Allens implemented several restructuring initiatives designed to maximize future performance and help the business weather the adverse environment.  As a result of these actions, combined with selective price increases, during fiscal year 2012 the Company's Adjusted Canned EBITDA increased to $24.2 million. However, the Company's margins remained below historical levels, the Debtors continued to experience operational difficulties and defaulted on certain financial and other covenants in their secured debt agreements and began to experience severe liquidity constraints.  Throughout 2013, the Debtors have continued to address operational improvements and have explored all available options to restructure their business.  On September 16, 2013 the Debtors, with the assistance of Lazard Middle Market, LLC ("**Lazard**"), commenced a marketing process to evaluate third party interest in acquiring all or a portion of the Company's assets.

**D.     Restructuring History**

24.     Prior to the commencement of these Chapter 11 Cases, the Debtors, with the assistance of their professionals, investigated several potential out of court restructuring alternatives.  After completing the sale of the frozen business in March 2012, the Company successfully completed a refinancing in June 2012; however, the refinancing failed to adequately relieve the liquidity issues affecting the Company and the Company's financial performance was not in line with expectations.  Therefore in January 2013, the Company retained A&M to assist in identifying potential performance improvement opportunities and to assist the Company with improving the available working capital.  At the same time, the Company began to investigate potential opportunities to improve their financial condition.  Allens engaged in discussions with a

9

third party to secure an equity investment; however, the Company and the third-party were unsuccessful in negotiating the terms of that investment.  Allens also engaged in negotiations with certain holders of their existing debt with respect to a refinancing transaction which also contemplated a sale of certain assets to a third party.  Ultimately, the potential transaction with the third party failed to close and the Debtors engaged in renewed negotiations with their existing lenders, which resulted in the execution of a non-binding term sheet outlining the terms of a potential transaction.  Although further operational issues and liquidity constraints have made execution on specific terms of the non-binding term sheet impractical, the Debtors have continued to engage in discussions with their lenders and other constituencies to reach agreement on a viable transaction.

### E.    Purpose of the Chapter 11 Filing

25.    The challenges faced by the Debtors have been substantial, including servicing the Pre-Petition First Lien Obligations and the Pre-Petition Second Lien Obligations, which has been exacerbated by several challenging growing seasons.  The Debtors' management team, with the assistance of A&M, has worked diligently to address the issues, including through operational improvements and the sale of non-strategic assets.  Unfortunately, the Debtors have continued to struggle to implement their business plan while attempting to at the same time service their debt.

26.    The Debtors intend to use the Chapter 11 Cases to identify potential investors or purchasers, investigate other potential restructuring transactions and possibly effect a sale of all or substantially all of the Debtors' assets.

27.    The Pre-Petition First Lien Parties have agreed to provide the Debtors with the use of Cash Collateral and a senior secured, superpriority debtor-in-possession loan facility (the "**DIP Facility**") to fund ongoing operations and restructuring costs during the Chapter 11 Cases

*NY 243023729v13*

on the terms and conditions described in more detail in Section D below and in the *Debtors'*
*Motion for Entry of Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363 and 364 and*
*Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedures (I) Authorizing*
*Debtors to Incur Post-Petition Secured Indebtedness, (II) Granting Liens and Superpriority*
*Claims to the DIP Lenders, (III) Authorizing Use of Cash Collateral and Providing Adequate*
*Protection, (IV) Modifying the Automatic Stay and (V) Scheduling Final Hearing* (the "**DIP**
**Motion**").

### III.
### FIRST DAY MOTIONS [3]

28.     Concurrently with the filing of the voluntary petitions to commence these cases,
the Debtors will be filing a number of First Day Motions.[4]  The Debtors anticipate that the
Bankruptcy Court will conduct a hearing within a business day or two after the commencement
of the cases (the "First Day Hearing"), during which the Bankruptcy Court will entertain the
arguments of counsel with respect to the relief sought in each of the First Day Motions.

29.     Generally, the First Day Motions have been designed to meet the immediate goals
of (a) establishing procedures for the efficient administration of these Chapter 11 Cases; (b)
continuing the Debtors' operations during these Chapter 11 Cases with as little disruption and
loss of productivity as possible; and (c) maintaining the confidence and support of the Debtors'
key constituencies.  I have reviewed each of the First Day Motions, including the exhibits,
attached thereto, and believe that the relief sought in each of the First Day Motions is narrowly

---

[3]  Capitalized terms used in Part III and not otherwise defined herein shall have the meanings ascribed to such terms
in the respective First Day Motions.

[4]  Any payment to be made, or authorization requested, in the First Day Motions shall be subject to the requirements
and restrictions imposed on the Debtors under any order authorizing the use of cash collateral or authorizing the
Debtors to enter into a debtor-in-possession financing facility and the documents associated with such facility, and
shall be subject to all claims, liens, security interests and priorities granted in connection with such facility.

*NY 243023729v13*

tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve success in these Chapter 11 Cases.

30.     The First Day Motions are summarized below:

**A.     Motion for Expedited Hearing on First Day Motions**

31.     The Debtors seek entry of an order setting a hearing on the First Day Motions at the earliest date possible in order to avoid immediate and irreparable harm to the Debtors' estates.  The Debtors also request that said order provide that the time to object to the First Day Motions be reduced to the time of said hearing, except that the hearing on the DIP Motion shall be a preliminary hearing to consider interim relief pending a final hearing.

**B.     Motion to Limit Notice, Approve Special Service List and Establish Notice Procedures**

32.     The Debtors seek entry of an order limiting notice to certain creditors and parties in interest and establishing notice procedures. The Debtors also respectfully request approval of the "**Special Service List**", as defined in the motion, and approval to update and amend the Special Service List from time to time to add parties requesting notice without further motion or order from the Court.  The Special Service List as requested in this Motion will provide creditors and other interested parties with adequate notice and opportunity to object as required by the Bankruptcy Code and the Bankruptcy Rules.

**C.     Motion of the Debtors for Entry of an Order Authorizing and Directing the Joint Administration of the Debtors' Chapter 11 Cases for Procedural Purposes Only**

33.     By this motion, the Debtors request the joint administration of the Debtors' related Chapter 11 Cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for the Debtors' cases and also request that the caption of their cases be modified to reflect the joint administration of the cases.

12

34.     Allens is a wholly owned subsidiary of All Veg, such that the Debtors constitute "affiliates" of one another within the meaning of 11 U.S.C. § 101(2).[5]  Joint administration of these cases (a) is warranted because the Debtors' financial affairs and business operations are closely related, and (b) will avoid the unnecessary administrative burden on the Court and parties-in-interest in these Chapter 11 Cases. Specifically, joint administration will permit the Office of the Clerk of this Court (the "**Clerk**") to use a single general docket for the Debtors' Chapter 11 Cases and to combine notices to creditors and other parties-in-interest of the Debtors' respective estates.  Joint administration also will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in each of the Chapter 11 Cases. Further, if the Court approves joint administration of the Debtors' cases, the Debtors will be able to reduce fees and costs resulting from the administration of these Chapter 11 Cases and ease the onerous administrative burden of having to file multiple documents.

**D.      Debtors' Motion for Entry of Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363 and 364 and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedures (I) Authorizing Debtors to Incur Post-Petition Secured Indebtedness, (II) Granting Liens and Superpriority Claims to the DIP Lenders, (III) Authorizing Use of Cash Collateral and Providing Adequate Protection, (IV) Modifying the <u>Automatic Stay and (V) Scheduling Final Hearing</u>**

35.     By this motion, the Debtors request the Bankruptcy Court's (a) approval of the Debtors' entry into the DIP Facility to fund ongoing operations and restructuring costs during the Chapter 11 Cases, pursuant to a budget (the "**Budget**") negotiated between the Debtors and the Pre-Petition First Lien Parties, and (b) authorization of the Debtors' use of Cash Collateral,

---

[5]  Section 101(2) of the Bankruptcy Code defines "affiliate" to include, in relevant part, a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . ."  11 U.S.C. § 101(2).

which are both critical to the Debtors' efforts to reorganize and maximize value for their estate, employees and creditors.

36.     Entry into the DIP Facility and securing the financing available thereunder is absolutely necessary to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties in interest.  Given the Debtors' liquidity needs, the DIP Facility is of critical importance to the Debtors' continued operations and to preserving going concern value, especially following the commencement of these Chapter 11 Cases and the general uncertainty in the marketplace that will accompany this process.  Specifically, the Debtors have an urgent need to obtain access to the DIP Facility to, among other things, continue the operation of their businesses in an orderly manner, maintain business relationships and assure the continuity of operations with, and ability to make payment to, vendors, suppliers and customers, pay their employees and satisfy other working capital and operational needs, while pursuing a sale or other restructuring.  Moreover, the Debtors believe that access to the DIP Facility will provide comfort and confidence to all parties in interest at this critical juncture.

37.     Given the Debtors' severe liquidity problems and their overall value as compared to the amount of debt outstanding under the Pre-Petition Loans, the DIP Facility was the only post-petition financing available to satisfies the Debtors' liquidity needs.  Accordingly, the Debtors submit that the terms of the DIP Facility are reasonable and represent the best source of financing available to the Debtors under the circumstances.

38.     The terms of the DIP Facility were negotiated in good faith between the Debtors and the lender, each of which was represented by separate counsel.  No consideration is being provided to any party in connection with the DIP Facility other than as set forth in the motion.

*NY 243023729v13*

39.    The Debtors (in consultation with myself and their other advisors) have determined that (a) the Budget is reasonable and will allow the Debtors to operate in the Chapter 11 Cases without the accrual of unpaid allowed administrative expenses; and (b) the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred for the period set forth in the DIP Budget.

**E.    Motion of the Debtors for Entry of an Order (A) Authorizing the Debtors to pay and Honor All: (I) Prepetition Compensation and Benefits to Employees, (II) Prepetition Compensation and Related Fees Associated With Temporary Employees, (III) Prepetition Employee Benefit Programs; and (IV) Withholding <u>Obligations, and (B) Authorizing Banks to Honor Related Transfers</u>**

40.    In order to enable the Debtors to maintain morale during this critical time, retain their current employees, and minimize the personal hardship such employees may suffer if prepetition employee obligations ("**Employee Obligations**") are not paid when due or honored as expected, the Debtors, by this motion, seek an order of this Court authorizing, but not directing, the Debtors to pay and honor all Employee Obligations and authorizing all banks to honor the Debtors' prepetition checks or electronic transfers for payment of any of the Employee Obligations.  In addition, the Debtors seek an order authorizing all banks to receive, process, honor, and pay any and all checks or electronic transfers drawn on the Debtors' payroll and general disbursement accounts related to ordinary course Employee Obligations, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

**a.  Employees**

41.    The Debtors employ approximately 1173 individuals, which includes Rick Allen, Josh Allen and Nick Allen, as part of their business enterprise, approximately 766 are hourly employees (the "**Hourly Employees**") and approximately 162 are salaried (the "**Regular Employees**").  In addition, as of the Petition Date, the Debtors' workforce was comprised of

15

approximately 319 temporary employees hired on a temporary basis through one of three staffing agencies (the "**Temporary Employees**" and together with the Regular Employees, the "**Employees**").

42.     The Employees perform a variety of crucial functions for the Debtor, including, without limitation, processing various products for its vegetable production business and canned vegetable business lines, interacting with customers and vendors, marketing the Debtors' products and generally sustaining the Debtors' business operations through various administrative, accounting, supervisory and managerial functions.  The Employees' skills and their knowledge and understanding of the Debtors' infrastructure, operations and customer relations are essential to the Debtors' efforts to preserve and maximize the value of the Debtors' business and assets.  Without the continued dedicated services of the Employees, the Debtors would not be able to continue operations.

**b.  Wages, Salaries and Payroll Obligations**

43.     All Regular Employees are paid their wages or salaries (for the purposes of this Motion, the term "**Wages**" shall mean wages, commissions and/or salaries) each Friday on a weekly basis one week in arrears.  Certain members of the Allens' sales team are eligible to earn commissions if the sales team member achieves certain targets.  The sales commissions are paid at the end of each fiscal quarter.  Throughout each week the Hourly Employees report their time and attendance through a Kronos system at each of the Debtors' facilities.  Each Monday the Debtors begin processing payroll for the period ending the prior Saturday.  Payroll is paid out each Friday.  Nearly all of the Regular Employees receive their Wages via direct deposit either through their existing bank accounts or through a bank card account opened specifically for the payment of Wages.  Therefore, for any given pay period the Debtors cut only a handful of checks

16

related to Regular Employees who have not yet been set up for direct deposit. The Debtors'
process payroll through their corporate office; no third-party processor is involved.

44.     Weekly gross Wages to the Regular Employees average approximately $774,000.
Because the Debtors pay their Regular Employees in arrears, as of the Petition Date
approximately one weeks' Wages will be outstanding. As of the Petition Date, the Debtors
estimate the accrued and unpaid Wages are approximately $885,000.

### c.  Benefits

45.     In the ordinary course of business, and as is customary for companies of their
size, the Debtors maintain various employee benefits and policies that provide the Regular
Employees with medical, dental, disability insurance and other benefits which are described in
more detail below (collectively, the "**Employee Benefits**").

### i.  Vacation Days, Sick/Personal Days and Other Leaves

46.     The Debtors offer paid time off ("**PTO**") and certain paid holidays to all
Employees. Employees may use their PTO for either vacation or sick days, in their discretion.
Employees accrue PTO on a schedule that is dependent on the individual Employee's length of
service. Employees whose length of service is (a) less than one year earn four (4) PTO hours per
month (and may earn up to six (6) PTO days per year), (b) more than one (1) year, but less than
eight (8) years, earn eight (8) PTO hours per month (and may earn up to twelve (12) PTO days
per year), (c) more than eight (8) years, but less than twenty (20) years, receive earn twelve (12)
PTO hours per month (and may earn up to eighteen (18) days per year), and (d) twenty (20) or
more years earn sixteen (16) PTO hours per month (and may earn up to twenty-four (24) PTO
days per year). Employees' PTO accrues based on the Debtors' fiscal year (March 1 to February
28/29).

47.     Employees must use their PTO in the year in which it is earned.  Employees may not receive pay in lieu of time off.  Employees may take up to half of their maximum PTO at any time during the fiscal year by "borrowing" PTO against their maximum.

48.     The Debtors seek authority to continue to allow its Employees to use their PTO in the ordinary course of business, including PTO that accrued for prepetition services, in accordance with the Debtors' prepetition practices and procedures.

### ii.  Medical/Dental/Vision/Prescription Drugs

49.     The Debtors currently provide a preferred provider plan (the "**PPO Plan**") to its Regular Employees and their dependents and one former employee, which includes medical, vision, and prescription drug benefits.  The PPO Plan is administered by Blue Cross Blue Shield.  The PPO Plan is self-insured through a health benefit trust.  Therefore, although Blue Cross Blue Shield administers the PPO Plan, the Debtors are ultimately responsible for the payment of any claims (less deductibles and co-pays) made against that plan.   Premiums, as determined by actuarial analysis, are funded approximately 75% by the company and 25% by the employees.  As of the Petition Date, the Debtors estimate that the accrued and unpaid costs for the PPO Plan is approximately $648,000 for all of its Employees.

50.     Regular Employees receive prescription drug coverage through Script Care.  Regular Employees may also enroll in a dental benefits plan administered by Delta Dental, which requires a small weekly payroll deduction for premiums, and vision care through Blue Cross Blue Shield for a flat $200 worth of coverage a year.  As of the Petition Date, the Debtors estimate that the accrued and unpaid costs for Script Care is approximately $42,500 for all of its Regular Employees.  Further, the Debtors estimate that the accrued and unpaid costs owed to Delta Dental as of the Petition Date are approximately $5,000 for all of its Regular Employees.

*NY 243023729v13*

51.     Because the PPO Plan is deemed a "high deductible plan" the Debtors' Regular Employees may contribute pre-tax dollars to a Health Savings Account to help pay for premiums, deductibles and co-pays under PPO Plan and dental plan.  The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute moneys held in trust and therefore, are not property of the Debtors' bankruptcy estates.

### iii.   Workers Compensation

52.     The Debtors maintain self-insured workers' compensation insurance through group captive insurance (the "**Group Captive**").   The Group Captive is prefunded and collateralized.  The Debtors pay premiums to the Group Captive through a premium financing agreement.  The Debtors also maintain other workers compensation insurance through other collateralized insurance programs.

### iv.   Post Employment Programs and Plans

53.     The Debtors also offer insurance as required under COBRA to all employees who leave the employ of the Debtors (the "**COBRA Plan**") which is administered by Ceridian COBRA Services.  In addition, the Debtors offer a fully-insured health insurance plan to retirees of the Debtor who retired before January 1, 2005, were at least sixty years of age at retirement, and who had accrued at least ten years of service with the Debtor at the time of their retirement (the "**Retiree Plan**").  Approximately 27 retired former employees currently participate in the Retiree Plan and no new enrollees in the Retiree Plan are permitted.  The Retiree Plan's monthly premium of approximately $2,250 is funded by the Debtors.  As of the Petition Date, the Debtors estimate that the accrued and unpaid cost for the Retiree Plan is approximately $2,250.  On October 25, 2013, the Debtors notified those former employees participating in the Retiree Plan that the Debtors were terminating the Retiree Plan effective immediately, but would continue to provide benefits under the Retiree Plan until January 31, 2014.

54.     Regular Employees are eligible to enroll in a 401(k) plan (the "**401k Retirement Plan**") on the first day of hire or any time thereafter.  The 401k Retirement Plan is administered by BoA, and it allows participating Employees to defer as much as one hundred percent (100%) of their eligible wages up to the IRS dollar limitation.   The fees associated with the 401k Retirement Plan are paid through disbursements from the 401k Retirement Plan or through the amounts Employees have invested.   The Debtors do not pay any fees related to the 401k Retirement Plan.   The Debtors match 25% of the first 4% that the employee contributes, excluding highly compensated individuals as defined by the Internal Revenue Service. The Debtors request authority to continue its 401k Retirement Plan, including matching of contributions consistent with past practices.

55.     The Debtors further offer a supplemental executive retirement plan ("**Supplemental Retirement Plan**") to approximately twenty-seven (27) of the Debtors' Employees who are deemed to be "highly compensated" under the Tax Code.  The Debtors do not match any contributions made by participating Employees in the Supplemental Retirement Plan.  The Debtors request authority to continue its Supplemental Retirement Plan.

### v.  Other Employee Plans

56.     In addition to the foregoing, the Debtors offer a number of other plans and programs to the Regular Employees. Regular Employees enrolled in the health plan are automatically enrolled in a basic life and accidental death and dismemberment plan through Lincoln Life.   The Debtors pays 75% of Regular Employees' premiums.   At their option, Employees may obtain additional coverage by paying an additional premium.

57.     Salaried Employees are also automatically enrolled in both short-term and long-term disability plans.  The short term disability plan is self insured and the long-term disability is fully insured.  The Debtor pays premiums at an average cost of $4,800 per month for the Salaried

20

Employees' long-term disability programs.  Due to the short-term disability being self insured, the average monthly cost for salaried employees varies by the amount of claims incurred.  For the past twelve months the claims incurred by salaried employees have equaled $5,000 per month on average.    For hourly employees, the debtor maintains a separate voluntary long-term disability plan that is fully insured and administers a self insured voluntary short term disability program.  The hourly disability plans are purchased by Employee-paid premiums.

58.    The Debtors further provide term life insurance for certain employees that have been employed with the Debtors for approximately 20 years under a program in place at the time they were hired, at a cost of approximately $3,600 per year to the Debtors.  As of the Petition Date, the Debtors estimate that the accrued and unpaid costs for the term life insurance is approximately $3,600 for all of its Regular Employees.

59.    The Debtors also offer all Regular Employees the option of participating in voluntary supplemental life insurance and permanent life insurance programs.  The regular Employees may also purchase supplemental medical insurance and other medical programs. Each of these plans are fully insured and purchased by Employee-paid premiums.

**vi.  Reimbursement of Employee Costs and Expenses**

60.    The Debtors have a formal policy whereby their Employees seek reimbursement of business-related expenses.  The Debtors reimburse Employees on a regular basis for certain ordinary course expenses incurred within the scope of the Employees' employment, including travel, lodging, transportation, meals, cell phone bills, fax charges and other miscellaneous expenses (collectively, the "**Business Expenses**").    All reimbursement requests must be submitted by means of an approved expense report along with the receipts.  The Debtors anticipate that many Employees will have not yet submitted their requests for accrued and unpaid Business Expenses.  Therefore, by this Motion, the Debtors seek authority to continue their

21

prepetition practices with respect to the Business Expenses and to pay all prepetition amounts outstanding in connection therewith.

61.     The Debtors provide certain employees either (i) an automobile allowance or (ii) an additional benefit to allow certain employees to operate a vehicle, and to facilitate those employees' commute to work (the "**Car Allowance**").  As of the Petition Date, approximately 19 employees receive a Car Allowance, these employees include Rick Allen, Nick Allen and Josh Allen.  The Debtors estimate that as of the Petition Date, the accrued and unpaid expenses related to the Car Allowance are approximately $2,100.

62.     The Debtors also own a number of properties near their operations which the Debtors rent out to Regular Employees at a below market rate.   As of the Petition Date, the Debtors are renting properties to approximately 4 Regular Employees.   The Debtors request authority to continue to renting these properties to their Regular Employees.

### a. Withholding Obligations

63.     The Debtors, as employers, are required by law to withhold certain amounts from their Employees' Wages for remittance to appropriate authorities which may include, but is not limited to, federal, state and local taxes, Social Security, Medicare, unemployment taxes, disability, or garnishments,[6] or, other voluntary withholdings such as contributions to 401K plans, insurance contributions, and charitable contributions, if any (collectively, the "**Withholding Obligations**").   Because some amounts withheld on account of Withholding Obligations may be attributable to prepetition periods, and may be in the Debtors' possession on

---

[6]  To the extent required to comply with orders received regarding the garnishment of Wages for, *inter alia*, domestic support, health support, or taxes, the Debtors garnish such Wages and remit the garnished funds to the applicable governmental authority.

22

the Petition Date, the Debtors seek authority to continue and honor those Withholding Obligations.

64.     The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute moneys held in trust and therefore, are not property of the Debtors' bankruptcy estates.  Thus, whether or not such funds are prepetition amounts, the Debtors believe that providing such funds to the appropriate parties does not require Court approval.  Nevertheless, out of an abundance of caution, the Debtors are seeking Court authority to pay any outstanding amounts owed by the Debtors for Withholding Obligations, in the ordinary course of business, including those incurred prior to the Petition Date.

### f.  Temporary Employees

65.     At any given time, approximately 25% of the Debtors' workforce is comprised of Temporary Employees hired on a temporary basis through one of three staffing agencies – Worksource, Inc. (for traditional staffing needs), Allegiant International (for farm and seasonal agricultural workers), and National Trucking Services (for truck drivers) (collectively, the "**Staffing Agencies**").  The number of the Debtors' Temporary Employees fluctuates depending on the season.  All three companies have common ownership.

66.     A large number of the Temporary Employees are farm and agricultural employees.  The Debtors are required to comply with the Migrant and Seasonal Agricultural Worker Protection Act (the "**MSPA**") with respect to many of the Temporary Employees.  The MSPA is designed to provide migrant and seasonal farmworkers with protections concerning pay, working conditions, and work-related conditions, to require farm labor contractors to register with the U.S. Department of Labor, and to assure necessary protections for farmworkers, agricultural associations, and agricultural employer.  The Debtors are not licensed farm

23

contractors, therefore they rely on the services of the Staffing Agencies, one of which is a licensed farm contractor.

67.     The Wages owed to the Temporary Employees are paid on a weekly basis, on Fridays, in arrears, by ACH payment directly to the Staffing Agencies. The Staffing Agencies make payment to the individual Temporary Employees for housing, meals, healthcare, unemployment and workers' compensation insurance and taxes. As of the Petition Date, weekly Wages to Temporary Employees (through the Staffing Agencies), average approximately $225,000. One payment to each Staffing Agency, rather than individual payments to over 250 Temporary Employees greatly lessens the burden on the Debtors' payroll department and reduces the costs associated therewith. As of the Petition Date, the Debtors estimate that the accrued and unpaid cost for Temporary Employees is approximately $800,000.

68.     Because Temporary Employees represent 20%-25% of the Debtors' workforce at a given time and without the Staffing Agencies the Debtors are unable to meet the requirements for retaining such workers, maintenance of the Debtors relationship with the Staffing Agencies is critical to the Debtors' relationship with its Temporary Employees, which, in turn, is critical to the Debtors' continued viability. As such, the Debtors respectfully request the authority to pay those amounts earned by unpaid to Temporary Employees by continued payment to the Staffing Agencies.

**F.      Motion of the Debtors for Entry of an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System, and (C) Waiving Certain Investment and Deposit Guidelines**

69.     By this motion, the Debtors seek an order: (a) authorizing the maintenance of Bank Accounts (defined below) and continued use of existing Business Forms; (b) authorizing, but not directing, continued use of existing Cash Management System (defined below); (c)

waiving certain of the investment and deposit Guidelines set forth by the Office of the United States Trustee for Region 13; and (d) providing any additional relief as is necessary to effectuate the foregoing.

70.     It is critical that the Debtors continue to consolidate its cash and centrally coordinate fund transfers in order to efficiently and effectively operate its large, complex business operations.  Substantially disrupting these cash management procedures would severely impair the Debtors' ability to preserve its going concern value and to successfully reorganize during these Chapter 11 Cases.  It is essential, therefore, that the Debtors be permitted to continue to use their current cash management system and existing bank accounts.

71.     Prior to the commencement of their Chapter 11 Cases, and in the ordinary course of their business, the Debtors maintained nine (9) bank accounts (the "**Bank Accounts**").  The Bank Accounts are part of a carefully constructed and highly-automated cash management system (the "**Cash Management System**") that ensures the Debtors' ability to efficiently monitor and control their cash position.  The Debtors' Cash Management System is maintained primarily with Bank of America Merrill Lynch ("**BoA**").  In addition, the Debtors maintain three small accounts with RBC Centura Bank ("**RBC**"), Citizens Bank ("**Citizens**") and Liberty Bank of Arkansas ("**Liberty**").  The Debtors' current Cash Management System has been in place for approximately one (1) year.  Currently, the Debtors utilize BoA for a majority of their banking needs and only use the accounts at RBC, Citizens and Liberty on rare occasions.

72.     The Debtors' Cash Management System as of the Petition Date is summarized as follows:

  a.  Blocked Depository Account:   The Debtors maintain a Blocked Depository Account (the "**Depository Account**") with BoA, to which deposits are made.  The Depository Account is subject to a control agreement (the "**Control Agreement**") with BoA, in both its individual capacity and its capacity as Pre-Petition First

25

Lien Agent and Cortland Capital Market Services LLC, in its capacity as Pre-Petition Second Lien Agent. The Debtors are permitted to use the funds in the Depository Account subject to the terms of the Control Agreement and the Pre-Petition First Lien Documents (it being acknowledged that such agreements require all amounts to be swept to pay the Pre-Petition First Lien Obligations). Deposits made into the Depository Account include checks, wire transfers, automated clearinghouse transfers, credit card payments (VISA, MasterCard, Discover and American Express as well as other debit cards), and cash receipts.[7]

b. <u>Operating Account</u>:   The Debtors also maintain operating accounts (the "**Operating Account**") with BoA which funds nearly all of the Debtors' operations.

c. <u>Controlled Disbursement Account</u>: The Debtors maintain a controlled disbursement account which is a zero-balance account and which the Debtors use to write checks to operate their business.

d. <u>Specialized Disbursement Accounts</u>:   The Debtors maintain three (3) disbursement accounts (the "**Disbursement Accounts**"), which operate for certain dedicated purposes.  One Disbursement Account makes payments in respect of the Debtors' employees' health benefits (the "**Health Benefits Account**").  The Debtors are a self-funded medical coverage provider, and after a request for reimbursement for medical expenses has been properly approved, the Health Benefits Account draws on the Operating Account to fund the reimbursement.  In addition, another of the Disbursement Accounts is a 401(k) account (the "**401(k) Account**").  The 401(k) Account processes payments in connection with the 401(k) benefit plan maintained by the Debtors.  The Debtors' third Disbursement Account is an account for the Debtors' profit sharing plan maintained by the Debtors and which makes payments in accordance with the Debtors' profit sharing plan.  Each of the Disbursement Accounts carries a *de minimis* average balance.

e. <u>Citizens and RBC Accounts</u>:  The Citizens Account and the RBC Account are used to fund any emergency purchases, such as repair parts or tools, or to fund employee expenses at the Debtors' Pulaski, Wisconsin and Montezuma, Georgia locations. Both the Citizens Account and the RBC Account carry *de minimis* average balances.

f. <u>Liberty Accounts</u>:  The Debtors maintain one (1) account at Liberty.  Cash that is collected from the Debtors' outlet retail locations is transferred by the Debtors into the Liberty Account, and the Debtors deposit those amounts directly into the Depository Account.

---

[7] Some of these payments, including credit card transactions, are first processed at certain of the Debtors' locations, with the funds being remitted from those locations to the Lockbox Account.

26

73.     The Debtors reconcile cash receipts on a daily basis, and perform a reconciliation of all of the deposits and debits in the Cash Management System once a month.  The Debtors' transition into chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of these cases with the same account numbers and, where applicable, automated relationship.  The Debtors further request authority to deposit funds in and withdraw funds from all such accounts, subject to the same access rights and limitations existing prior to the Petition Date, including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers, and other debits and to treat the Bank Accounts for all purposes as debtor-in-possession accounts.

74.     In the ordinary course of business, the Debtors use pre-printed check stock with the relevant Debtor's name printed thereon.  In addition, the Debtors maintain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials, and other business forms (collectively, along with the Debtors' checks, the "**Business Forms**").  The Debtors have a significant stock of Business Forms already printed and available for use.  To minimize administrative expense and delay, the Debtors request authority to continue to use their Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' "Debtor in Possession" status.

75.     Prior to and as of the Petition Date, certain of the Bank Accounts were subject to deposit account control agreements and other interests granted to the Pre-Petition First Lien Agent pursuant to the terms of the Pre-Petition First Lien Loan Documents.  The Debtors request that the Pre-Petition First Lien Agent, prior to entry of the DIP Order, and the DIP Agent thereafter, continue to be entitled to all of the rights and benefits set forth in all such deposit account control agreements and other interests and rights relating to the Bank Accounts granted

27

to the Pre-Petition First Lien Agent prior to the Petition Date.  Among other rights conferred to the Pre-Petition First Lien Agent prior to the Petition Date, the Dominion Accounts are under the sole dominion and control of Pre-Petition First Lien Agent and were swept on a daily basis pursuant to the Pre-Petition First Lien Loan Documents.  Consistent with the terms of the DIP Order and the DIP Loan Documents, the Debtors request that Dominion Accounts remain under the sole dominion and control of the Pre-Petition First Lien Agent pursuant to the terms of the Pre-Petition First Lien Loan Documents until such time as the DIP Order is entered, and thereafter under the sole dominion and control of the DIP Agent pursuant to the terms of the DIP Order and the DIP Loan Documents.   The Debtors also seek authority for the (a) Pre-Petition First Lien Agent, prior to entry of the DIP Order, to continue to sweep the Dominion Accounts on a daily basis and hold such funds in reserve subject to the Debtors' use of such funds solely in accordance an Approved Budget, and (b) the DIP Agent, upon and after entry of the DIP Order, to sweep the Bank Accounts on a daily basis and the apply such funds pursuant to the terms of the DIP Order.

**G.**     **Motion of the Debtors for Entry of an Order (A) Authorizing the Debtors to Pay Prepetition Sales, Use, and Similar Taxes and Regulatory Fees in the Ordinary Course of Business, and (B) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

76.     In connection with the normal operation of their business, the Debtors pay an assortment of sales, use, and similar taxes (collectively, the **"Taxes"**) to various federal, state, and local taxing authorities (collectively, the **"Taxing Authorities"**).  These Taxes include, without limitation, the following:

a.  In the normal course of their business, the Debtors incur sales taxes (the **"Sales Taxes"**) on the sale of their products.  The Debtors collect and remit or otherwise pay Sales Taxes as needed to the applicable Taxing Authorities.  In addition to the Sales Taxes owed but not yet paid as of the Petition Date, the Sales Taxes may also include amounts paid by checks sent prior to the Petition Date that have not cleared the Debtors' bank accounts on the Petition Date, though the Debtors are not aware of any such checks.

28

**b.** In addition, in the normal course of their business, the Debtors incur use taxes (the **"Use Taxes"**) on account of the purchase of various inventory, raw materials, supplies or other goods used in the Debtors' business. The Use Taxes typically arise pursuant to purchases the Debtors make from out of state vendors that do not collect state sales tax on such out of state purchases. The Use Taxes are typically equivalent to the amount of sales tax that would have been charged on the purchase of such goods if the purchase had occurred within the state where the vendor is located. In addition the Debtors incur Use Taxes in Arkansas from self-assessed purchases made by the Company pursuant to a direct pay permit instead of payment of the sales taxes directly to the vendor for them to remit to the state. The Debtors estimate that they owe approximately $97,434.00, in accrued and unpaid Sales Taxes and Use Taxes as of the Petition Date.

77.     In the aggregate, the Debtors owe approximately $98,448.74 in Taxes as of the Petition Date. In an abundance of caution, the Debtors request authority to pay an amount not in excess of $108,294.00 in respect to the accrued unpaid Taxes. The payment of prepetition Taxes will help the Debtors avoid serious disruption to their operations that would result from the failure to pay such Taxes, including the distraction and adverse affect on morale that could result from liability for nonpayment imposed upon the Debtors' directors and officers. Furthermore, nonpayment of these obligations may cause Taxing Authorities to take precipitous action and preventing the Debtors from conducting business in applicable jurisdictions, and seeking to lift the automatic stay, all of which could disrupt the Debtors' day-to-day operations, impose significant costs on the Debtors' estates, and destroy the going-concern value of the Debtors' business.

**H.     Motion of the Debtors for Entry of an Order Authorizing the Debtors to (A) Maintain Existing Insurance Policies, Pay All Policy Premiums and Brokers' Fees Arising Thereunder, and Renew or Enter Into New Policies, and (B) Continue Insurance Premium Financing Programs, Pay Insurance Premium Financing Obligations Arising In Connection Therewith and Renew or Enter Into New Premium Financing Arrangements**

78.     By this motion, the Debtors seek to (a) maintain existing insurance policies, pay all policy premiums and brokers' fees arising thereunder, whether prepetition or postpetition, and renew or enter into new policies as needed, and (b) continue insurance premium financing under

the Debtors' premium financing agreements and pay insurance premium obligations arising thereunder, or in connection therewith, without further order of the Court.

79.     In the ordinary course of the Debtors' business, the Debtors maintain numerous insurance policies providing coverage for, *inter alia,* commercial general liability and pollution legal liability, umbrella liability, automobiles, shipping and cargo, property, excess property, flood, foreign liability, fiduciary liability, directors' and officers' liability, aircraft liability and workers compensation (collectively, the "**Policies**").   These Policies are essential to the preservation of the Debtors' business, properties, and assets, and, in many cases, such insurance coverages are required by various regulations, laws, and contracts that govern the Debtors' business conduct.

80.     The Debtor is insured through the Group Captive insurance company that was established in 1991.   It is considered a mutual insurance company taking 953d elections to be taxed as a U.S. Corporation.   Currently it has 17 members, with approximately $25,000,000 in premium.   Membership consists of a variety of food related companies.   Zurich North America provides fronting and reinsurance.   Artex Risk Solutions provides captive management.   Pinnacle Actuary provides actuary work and KPMG is the audit firm.   Risk Control Services and third party claims administration is managed by Gallagher Bassett Services.   This captive insurance structure provides workers compensation, general liability, automobile liability and physical damage protection for the Debtors, taking advantage of improved loss costs normally associated with loss sensitive programs such as self-insurance, yet it still provides predictability needed for funding and first dollar coverage.   Each member's premium is developed based on the member's loss experience and allows each member to effectively control its long term costs.   The Group Captive is prefunded and cash collateralized.   The premiums owed to the Group Captive are

financed through the Bank Direct Capital Finance. In addition to the Group Captive, certain of the Company's workers compensation policies are bonded through other self-insured and collateralized insurance programs.

81.     The Policies are essential to the Debtors' business, and the Debtors believe it is in the best interests of their estates to permit the Debtors to honor their obligations under their current insurance contracts (including related brokers' fees). Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtors' efforts to preserve and maximize the value of their estates.

82.     The Debtors have determined in their business judgment that it is not economically advantageous for the Debtors to pay the premiums for all of their Policies on an annualized basis. Accordingly, in the ordinary course of the Debtors' business, the Debtors finance the premiums on certain of the Policies pursuant to premium financing agreements (each a "**PFA**") with IPFS Corporation ("**IPFS**") and Bank Direct Capital Finance ("**BDCF**"), each a third-party lender.

83.     The IPFS PFA presently requires a down payment of $26,693.84 and cumulative monthly installment payments of the same amount due on the first day of each month beginning on April 1, 2013, and continuing for a period of eleven (11) months ending January 1, 2014. The IPFS PFA bears a total finance charge of $6,145.08 on the total financed amount of $287,487.16. The annual interest rate under the BDCF PFA is 4.25%. The terms of the PFA provide that the Debtors pay IPFS monthly installments in exchange for IPFS's agreement to pay the full annual insurance premium, in advance, to the Debtors' various insurance providers.

84.     Pursuant to the PFA, the Debtors' obligation to IPFS is collateralized by a security interest in all right, title and interest to the relevant Policies, including (but only to the

extent permitted by applicable law) (i) all money that is or may be due to the Debtors because of a loss under any of the relevant Policies that reduces the unearned premiums (subject to the interest of any applicable mortgagee or loss payee), (ii) any unearned premium under each of the relevant Policies, (iii) dividends which may become due to the Debtors in connection with any of the relevant Policies and (iv) interests arising under a state guarantee fund.

85.    The BDCF PFA presently requires cumulative monthly installment payments of $151,943.32 due on the first day of each month beginning on April 1, 2013, and continuing for a period of ten (10) months ending January 1, 2014.  The BDCF PFA bears a total finance charge of $18,634.95 on the total financed amount of $1,500,798.25.  The annual interest rate under the BDCF PFA is 2.7%.  The terms of the PFA provide that the Debtors pay BDCF monthly installments in exchange for BDCF's agreement to pay the full annual insurance premium, in advance, to the Debtors' various insurance providers.

86.    Pursuant to the PFA, the Debtors' obligation to BDCF will be collateralized by a security interest in all sums payable to the Debtors under the relevant Policies, including, among other things, any gross return premiums and any payment on account of loss which results in reduction of unearned premium in accordance with the terms of such Policies.

87.    The Debtors seek authorization to pay any prepetition premiums related to the Policies to the extent that the Debtors might discover and determine, in their discretion (subject to the requirements and restrictions imposed on the Debtors under any order authorizing the use of cash collateral or authorizing the Debtors to enter into a debtor-in-possession financing facility), that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the Policies.  Although the Debtors are not presently aware of any such premium

obligations or the necessity of such payment, the Debtors seek this authority out of an abundance of caution, in recognition of the critical necessity of keeping their insurance policies in effect, and out of concern that if the necessity for such a payment arises in the future, the passage of time while the Debtors seek and obtain the Court's authority for such a payment may have irreversible adverse consequences for the Debtors' coverage under the Policies.

88.     If the Debtors are unable to continue making payments on the Policies, IPFS and BDCF may be permitted to terminate certain of the Policies to recoup their losses.  Furthermore, if the Debtors are unable to continue making payments on the PFA and/or the Policies, the insurance company may not allow the Debtors to renew these Policies at the current rates in the future.  The Debtors would then be required to obtain replacement insurance on an expedited basis and at great cost to their estates.  Even if the insurance company was not permitted to terminate the Policies, any interruption of payments would have a severe adverse effect on the Debtors' ability to extend current Policies or acquire new insurance coverage in the future.

**I.      Motion of the Debtors for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligation to Customers and to Otherwise Continue Certain Prepetition Customer Practices and Programs in the Ordinary Course of Business**

89.     The Debtors maintain a variety of customer-related programs that provide direct benefits to the Debtors' customers and promote customer loyalty, including without limitation, promotional rebates, cash payment discounts, coupons and refunds (collectively, the "**Customer Programs**").  The Debtors seek entry of an order authorizing, but not directing, the Debtors, in their sole discretion (subject to the requirements and restrictions imposed on the Debtors under any order authorizing the use of cash collateral or authorizing the Debtors to enter into a debtor-in-possession financing facility), to (a) honor outstanding obligations earned by and owing to their customers under the Debtors' Customer Programs, and (b) provide refunds, credit

adjustments and/or discounts to their customers in satisfaction of accrued prepetition obligations incurred by the Debtors under their Customer Programs.

90.     The success and viability of the Debtors' business and the Debtors' ability to successfully maximize value for the stakeholders in these cases are dependent in large part upon the patronage and loyalty of their customers.  Maintaining the Customer Programs is critical to the continuation of customer loyalty and satisfaction, and failure to continue these programs would severely and irreparably impair the Debtors' customer relations and put the Debtors at a significant disadvantage compared to their competitors.  Further, the Debtors' creditors will benefit from the relief sought herein, as approval of the Customer Programs will protect the Debtors' goodwill and going concern value during these Chapter 11 Cases and enhance the Debtors' value.

91.     Prior to the Petition Date, in the ordinary course of their business and as is customary in the industries in which the Debtors operate, the Debtors implemented certain Customer Programs, including but not limited to the following:

   a. **Promotional Rebates:** The Debtors maintain a promotional rebate program for customers - mostly large retail stores (the "**Promotional Rebate Program**").  Pursuant to the Promotional Rebate Program, the qualifying customers are entitled to a certain percentage of their sales of the Debtors' products being credited to their accounts as business development, Co-op or marketing funds.  The Debtors determine the amount of the individual rebate based on a number of factors, including the size of applicable customer's purchases.  The Promotional Rebate Program is a critical element of the Debtors' Customer Programs.  It is an essential element in both maintaining customer relationships and promoting active marketing for the Debtors at a local level.  The Debtors estimate that an approximate aggregate adjustment of $1.2 million pursuant to the Promotional Rebate Program has accrued as of the Petition Date.

   b. **Cash Payment Discount:** In addition, the Debtors provide a discount to its customers if payments on invoices for goods are received within ten (10) days of receiving said invoices (the "**Cash Payment Discount**").

   c. **Coupon Program:** In order to induce customers to purchase their products, the Debtors offer manufacturer coupons.  A customer presents these coupons at the time of purchase in exchange for a reduction of the purchase price.  In order to process these coupons the

34

Debtors utilize coupon clearing houses. The coupon clearing houses collect the coupons from the merchants and present the Debtors with an invoice representing the total value of the collected coupons. The Debtors then reimburse the coupon clearing houses for the amount of the invoice and the clearinghouse sends a check to the individual stores for the amounts of the coupons used in that store.

d. **Customer-Specific Price Discounts:** The Debtors assume customer-specific pricing as standard practice. Pricing schedules are established on customer by customer bases through planning and negotiations, with varying durations.

e. **Seasonal Promotions:** The Debtors offer additional price discounts based on seasonal timeframe and events to promote increased volumes ("**Seasonal Promotions**"). These Seasonal Promotions generally correspond to timeframes preceding and during events that are widely recognized by its target consumer base, including widely recognized holidays.

**J.    Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Shipping and Warehousing Charges in the Ordinary Course of Business**

92.    By this motion, the Debtors seek to prevent any disruption of their business operations. They request authority to pay certain prepetition shipping and warehouse related charges, including but not limited to the Carrier Fees (collectively with any possessory liens, the "**Shipping and Warehousing Charges**") to the Shippers and Warehousemen.

93.    As part of their business operations, the Debtors rely on shippers, common carriers, dedicated carriers, warehouse facilities, and upon a third party transportation and logistics provider (a "**Logistics Provider**" and collectively, the "**Shippers and Warehousemen**"). In particular, the Logistics Provider source a portion of freight through a network of carriers (the "**Network Carriers**"), in its capacity as the Debtors' agents. In some instances, the Network Carriers submit invoices to the Logistics Provider, which audits the invoices of the Network Carriers. The Logistics Provider then submits invoices to the Debtors which include the total amount of all Network Carrier invoices received and fees from a third party transportation, logistics and supply chain management (collectively, the "**Carrier Fees**"). The Debtors then remits payment to the Logistics Provider approximately two to fourteen days

35

after receipt of the invoices for Carrier Fees.  The Logistics Provider then remits payment directly to the Network Carriers. In addition, the Logistics Provider provides some warehousing services to the Debtors for the storage of their goods, equipment and inventory prior to shipment by the Network Carriers.

94.    The Debtors expect that, as of the Petition Date, certain of the Shippers and Warehousemen will have outstanding invoices for Shipping and Warehouse Charges that were incurred by the Debtors prior to the Petition Date.  Under the laws of some states and provinces, a shipper or a warehouseman may have a lien on the goods, equipment, and inventory in its possession, which secures the charges or expenses incurred in connection with the transportation or storage of the goods, equipment, and inventory.  In addition, pursuant to section 363(e) of the Bankruptcy Code, a shipper or a warehouseman, as a bailee, may be entitled to adequate protection of a valid possessory lien.  The Shippers and Warehousemen will likely argue that they are entitled to possessory liens, as applicable, for transportation of and storage of the goods, equipment, and inventory in their possession as of the Petition Date and may refuse to deliver or release such goods, equipment, and inventory before their claims have been satisfied and their liens redeemed.

95.    The Debtors believe that it is necessary and essential to the value of their estates that they be permitted to make payments on account of the Shipping and Warehousing Charges and seek to pay certain Shipping Charges and Warehouse Charges in order to maintain their shipping and warehousing network, assure an uninterrupted flow of goods and obtain the release of the goods, equipment, and inventory held by such Shippers and Warehousemen.  The Debtors estimate that as of the Petition Date approximately $7,000,000 is owed to the Shippers and Warehousemen.

NY 243023729v13

**K.** **Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (A) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment**

96.     In connection with the operation of their businesses and management of their estates, the Debtors obtain electricity, gas, waste management, internet, telecom, alarm and/or other similar services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Providers**").  In the ordinary course of business, the Debtors regularly incur utility expenses for Utility Services provided by various Utility Providers.  The Debtors' aggregate average monthly cost for utility services is approximately $938,158.

97.     Uninterrupted utility services are essential to the preservation of the Debtors' estates and assets, and therefore, to the success of these cases.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to preserve and maximize the value of their respective estates could be severely and irreparably harmed. Specifically, the Debtors' business centers on freezing produce.  A lack of electricity would render the Debtors' business inoperable as they would have no way to keep producing product. Likewise, the Debtors would be unable to operate their farms and factories without water, sewer and sanitation services.  It is therefore critical that utility services continue uninterrupted.

**L.** **Application for Entry of an Order Authorizing the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Noticing and Claims Agent**

98.     By this Application, the Debtors hereby seek the entry of an order (a) appointing Epiq Bankruptcy Solutions, LLC ("**Epiq**") to perform certain consulting services regarding noticing, claims management and reconciliation, plan solicitation, balloting, disbursements and any other services agreed to by the parties in these Chapter 11 Cases (in such role, the "**Claims Agent**"); and (b) authorizing the Debtors to compensate Epiq for its services and reimburse Epiq

for any related expenses in accordance with applicable provisions of the Agreement for Services between Epiq and the Debtors (the "**Services Agreement**"), a copy of which is annexed to the motion.

99.     There are hundreds of creditors and other parties in interest involved in these Debtors' Chapter 11 Cases.  This significant number of parties will impose heavy administrative and other burdens upon the Court and the Clerk.  Further, neither the Debtors nor the Debtors' counsel have the capability of adequately providing the services to be provided by Epiq without greatly diminishing Debtors and Debtors' counsel ability to focus its effort on managing the day-to-day operations of the business and of these Chapter 11 Cases.  To relieve the Court, the Clerk, and the Debtors of these burdens, the Debtors propose to appoint Epiq as claims, noticing and balloting agent in these Chapter 11 Cases.

100.    Epiq is a data processing firm that specializes in, among other things, chapter 11 administration, including noticing, claims processing, solicitation, ballot tabulation and other administrative tasks in chapter 11 cases.  The Debtors believe that Epiq's assistance will expedite service of notices, streamline the claims administration process and permit the Debtors to focus efficiently on its reorganization efforts.  The Debtors believe that Epiq is well-qualified to provide its services.

**M.      Other Motions and Applications**

101.    In the early days of the Chapter 11 Cases, the Debtors anticipate seek entry of certain additional orders, which will assist them in the orderly conduct of these cases and are vital to the smooth transition in and through Chapter 11.  The Debtors anticipate filing motions authorizing them to employ and retain various professionals to assist them in the conduct of these cases, including:

       (a)     Greenberg Traurig, LLP, as counsel for the Debtors;

38

(b)      Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C., as co-counsel for the Debtors;

(c)      Lazard Middle Market LLC as investment bankers for the Debtors;

(d)      Alvarez & Marsal North America LLC to provide a chief restructuring officer and additional personnel and appointing Jonathan C. Hickman, as chief restructuring officer to the Debtors;

(e)      GA Keen Realty Advisors, LLC, as Real Estate Agent to the Debtors; and

(e)      Professionals Utilized by the Debtors in the Ordinary Course of Business.

102.    The Debtors further anticipate filing an applications for administrative orders establishing procedures for the interim and monthly compensation and reimbursement of expenses of professionals, establishing procedures for the submission of reclamation and PACA claims, and establishing a bar date for the submission of claims pursuant to Section 503(b)(9) of the Bankruptcy Code.

## IV.
## CONCLUSION

103.    For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Bankruptcy Court grants the relief requested in each of the First Day Motions and respectfully request the Bankruptcy Court to do so.

[Signature on next page]

NY 243023729v13

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Dated: 10/27/13

Jonathan C. Hickman